## HELFER v. CORONA PRODUCTS, Inc.
### No. 12176.

Circuit Court of Appeals, Eighth Circuit.
April 14, 1942.

614

Harold C. Hanke, of St. Louis, Mo., for appellant.

Thomas B. Pryor, of Fort Smith, Ark. (Vol T. Lindsey, of Bentonville, Ark., on the brief), for appellee.

Before SANBORN, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

WOODROUGH, Circuit Judge.

On November 22, 1935, the Corona Products, Inc., an Arkansas corporation, and J. J. Helfer of St. Louis, Missouri, entered into a written contract for the employment of Mr. Helfer as the corporation's sales agent. Disputes arose between them, and on September 26, 1938, Mr. Helfer brought this suit in equity against the corporation for an accounting and recovery of commissions and to recover expenses and damages for which he claimed the corporation was obligated by reason of its alleged breaches of the contract. The issues were joined upon a third amended petition of the plaintiff, defendant's answer thereto and plaintiff's reply. The court referred the whole case to a master to take the testimony and to report findings of fact and conclusions of law.

The master died after taking the testimony and before making his report, and a second master was appointed as "master in succession". He considered the pleadings, the transcribed testimony and exhibits, and made report to the district court some nineteen months after his appointment. The district court, on consideration of the report, the plaintiff's exceptions to it, the transcribed testimony and the exhibits, entered decree some four months later dismissing the case at plaintiff's cost. Plaintiff appeals from the decree.

At the outset we take occasion to point out that although the plaintiff's petition prayed for the appointment of a master in the case, there was no showing that any exceptional condition required such appointment for the whole case within the intendment of Rule 53, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. "A reference to a master shall be the exception and not the rule", and where, as in this case, nothing more was involved in the suit than to ascertain and adjudicate how much, if anything, this small defendant company owed its sales agent in respect to the contract it had with him, and where all the testimony was taken in less than four days of hearings, the duty of trying and deciding the case and of filing the findings of fact and conclusions of law supporting the decree was upon the court. The report, which was dilatorily filed by the "master in succession", was not made in conformity with applicable Rule 53. Although specific findings of fact relative to the numerous fact issues were submitted to the master on the part of the plaintiff, the master made no rulings respecting such requests. He did not define the issues presented by the pleadings and evidence, or state his findings of fact upon such issues or his conclusions of law, but contented himself with general narrative expressions of opinion, conclusions and a recommendation that the case be dismissed. On the hearing of the exceptions taken to the master's report, the district court did not hear oral arguments of counsel, but in connection with its decree dismissing the case the court filed its opinion in writing in which contentions of the parties are discussed and reasons for the decision are set forth.

It results from the procedure in the trial court that the record on appeal

does not present definite findings of fact or declarations of law in support of the decree brought up for our review, as contemplated by the Rules of Civil Procedure, and in ordinary course we should be required to reverse the decree and remand the case with direction to the district court to supply such findings and conclusions. But the plaintiff in the case has shown that he is without means, the lawsuit has pended three and a half years and is now being prosecuted in forma pauperis, and we are urged to treat the report of the master and the opinion of the trial court as in compliance with the rules to the extent that findings of fact and conclusions of law may be inferred from them, and to review the decree. Accordingly, we review the decree appealed from, but we are bound by Rule 53, Federal Rules of Civil Procedure and we may not set aside findings of fact of the trial court disclosed by its opinion unless clearly erroneous, and such findings of the master as are disclosed by his report to the extent that the court has adopted them may not be set aside unless clearly erroneous.

### Statement.

It appears that at the time the contract involved in the suit was entered into the defendant owned and operated a silica mine and a plant for processing and shipping the product at Rogers, Arkansas, and the plaintiff had had experience in selling concrete and silica. By the terms of the contract the defendant employed the plaintiff to devote himself exclusively to the work of selling, promoting sales of and making new markets for defendant's products designated generally as Tripoli Silica. Plaintiff agreed to maintain an office at his own expense in Washington, D. C., or some other large city in the middle west, and to defray all expenses in connection with his work, including among other things, the expense of traveling, stenographer, office, rent and maintenance, postage and all telegrams, radios and telephone calls, excepting such as might be specifically assumed by defendant, and excepting the telegrams and telephone calls to Rogers which were approved by defendant's manager. Paragraphs 4 and 5 of the contract read:

"(4) Helfer is informed that corporation is now selling its product for use in the drilling of and completing oil and gas wells, and it is stipulated that he is not to sell this trade except by special agreement with H. G. Barnes and B. O. Mayfield of Beaumont and Houston, Texas, respectively.

"(5) The product of corporation is now being used as an admix, as a constituent in the manufacture of paints, and as fillers in the making of various products, in addition to its use in the oil field business. It is mutually agreed and understood that with the exception set out in paragraph number (4) above, and business received from our present dealers, all accepted orders, whether the orders be received from customers by direct address to corporation's home office or through Helfer, are to be regarded as sales made by Helfer within the purview of this contract."

It was provided that on the sales of "admix" plaintiff was to be paid as his commission the difference between the sales price per ton paid defendant and $8 per ton when such sales price was not more than $12 per ton. When such sales price was more than $12 per ton, plaintiff's compensation was one-third of the sales price. On sales of Tripoli Silica used for paint he was to be paid the difference between $12 and $18 per ton, but when the sales price exceeded $18 per ton, he was to receive one-third of the sales price. All sales prices referred to were F. O. B. on cars at defendant's mill at Rogers, Arkansas.

It was also provided that special arrangement as to price terms and compensation might be made with reference to sales where magnitude of the sale or other characteristic appeared to make special arrangement advisable, without operating to change the provisions of the contract.

There was provision that in the event the defendant should sell out or discontinue operation of its plant, remuneration to plaintiff for cancellation of the contract might be mutually agreed upon. "In the event such remuneration cannot be mutually agreed upon corporation reserves the right to arbitrarily cancel this contract by paying Helfer $5,000 if such cancellation is prior to the expiration of one year after date of this contract, and thereafter an addition of $1.00 One Dollar per ton for all ground Corona Products Tripoli Silica and ($.25) Twenty five cents per ton on all crude (not ground) Corona Products Tripoli Silica, sold by Helfer under this contract prior to such cancellation. Said payment to be made within ninety days after

cancellation of this contract at the general office of the corporation."

It was also provided that defendant would execute all orders which would yield $8 per ton to it if approved and that orders would be approved "whenever warranted in good business practice." Paragraph 2(b) stated that plaintiff's commissions should be paid on the 5th of the month following payment by the customer, and if not paid by then they should be accounted for by defendant and paid before the expiration of the fifth day after the end of the fiscal (which was the calendar) year.

Paragraph 6 stated that it was anticipated by both parties new uses for defendant's products would be developed and it was provided that as to any such uses developed by plaintiff a basis for compensation for plaintiff in respect thereto should be arranged and reduced to writing between the parties.

Paragraph 7 read: "It is mutually agreed that the term of this contract shall be five years reckoned from the latest date shown hereon as date of execution, provided Helfer shall during said term have furnished bona fide orders accepted by the corporation amounting to not less than (1500) One Thousand Five Hundred tons the first year of this contract and (2000) Two Thousand tons each, the second, third, fourth, and fifth year, it being understood any such order above mentioned cancelled through no fault of the corporation shall not be included in above totals. Any additional tonnage in any one year above the minimum above set out, may be considered a part of the following year's requirement, provided new orders for any one year totals as much as One Thousand tons."

### The Pleadings.

Plaintiff's third amended petition, on which the case was tried, made the contract a part thereof by reference and alleged that upon the execution of the contract plaintiff established an office at Washington and diligently applied himself to the performance of the obligations of the contract on his part to be performed. He effected sales of large quantities of defendant's products and with defendant's consent established agencies with dealers throughout the country to whom the products were shipped on consignment for resale in their respective territories. The petition did not contain a list of the sales made by plaintiff on which he claimed to have earned commissions, but it was alleged that the defendant furnished the plaintiff a statement each month during the period between January 5, 1936, until October 5, 1938 (excepting January and February 1938) purporting to show the sales on which commissions were earned and the amounts of the commissions, and photostatic copies of the statements were made part of the petition. Plaintiff alleged that the monthly statements did not show all that he earned and that he had consistently protested against them; that defendant had exclusive information of the commissions due and that an audit and accounting was necessary.

Although the contract provided generally that plaintiff should defray all expenses in connection with the work undertaken by him, including among others the expense of traveling, stenography, office rent and maintenance, postage and all telegrams, radios and telephone calls, there was exception in the contract as to those expenses "specifically assumed by the corporation" and "telegrams and telephone calls to Rogers at company expense at manager's approval" and plaintiff alleged that certain described items of expense for travel, telegrams, telephone calls and investigations were paid or incurred by him in the prosecution of his work which came within the exceptions of the contract and that defendant was obligated therefor.

It was also alleged that the plaintiff's contract became a valuable contract by reason of his expenditure of time and money in promoting and securing markets for defendant's products but plaintiff was deprived of such value because the defendant wrongfully failed and refused to cooperate with plaintiff as contemplated by the terms of the contract and that defendant wrongfully refused to make payments as required or to promptly fill orders obtained by plaintiff or to comply with formulas for the product required for prospective markets and by prospective purchasers secured by plaintiff, all of which should have been and could have been done by defendant at little or no expense to it.

It was not alleged that the contract had terminated, but the prayer was for an accounting and recovery of commissions found to be owing up to the time of recovery and for the recovery of the ex-

pense items. Plaintiff also prayed in the alternative that the court determine and award plaintiff judgment for the value of the unexpired term of the contract which it was alleged on information and belief was $10,000, or order the contract to remain in force and require the defendant to report and make payment of commissions accruing under the same. Plaintiff also prayed for interest and for general equitable relief.

The defendant admitted the contract in its answer and plead a general denial. It incorporated allegations in the nature of demurrer to several parts of plaintiff's petition. It also alleged that all payments which became due from it to the plaintiff were made by defendant in accordance with the terms of the contract "as shown by the contract itself exhibited to the complaint and the other exhibits attached thereto". Such other exhibits were the monthly statements of account reproduced by photostatic copies and made part of the petition. The answer also alleged that "the plaintiff is representing competitors of the defendant and he has thereby breached his contract with the defendant". There was no allegation that the contract had been terminated prior to the commencement of the action. Allegations by way of counterclaim were made at the conclusion of the answer as follows: "Defendant further states that it has since the institution of this suit requested the plaintiff to cease holding himself out as a representative of the defendant which the plaintiff has failed and refused to do to the great damage of the defendant in the sum of $10,000.00."

Defendant prayed judgment for dismissal of plaintiff's action and for judgment on the counterclaim against plaintiff for $10,000 and for an injunction enjoining plaintiff from holding himself out as the representative of the defendant.

In his reply to the answer, the plaintiff admitted that he had continued to hold himself out as the salesman of defendant since the date of the contract and that "he does represent the defendant under the terms of the contract." He denied that he represented competitors of the defendant. He demurred to the allegations of the answer which are in the nature of a counterclaim.

### The Issues.

On the hearing before the master the plaintiff introduced the testimony of an accountant employed by him who had made an audit of the sales invoices and the books and records of defendant from which he testified that according to the contract the commissions due the plaintiff at the time of the hearing, after allowing all just credits, amounted to $14,185.95. The plaintiff testified on his own behalf that in addition to such commissions there were sums aggregating $1,568.50 due him on account of traveling, hotel and other expenses specifically assumed by defendant within the intendment of the contract. He described the course of the business from the date of the contract to the time of the hearing and his version of the refusals by defendant to comply with his requests upon which he relied to maintain his claim that defendant had breached the contract by failure to render cooperation.

The hearing was adjourned after the plaintiff's testimony was heard and defendant then caused an audit to be made by its bookkeeper and an accountant whom it employed for the purpose. The bookkeeper and that accountant testified that upon the audit made and presented by them no commissions were due the plaintiff but he had been overpaid $436.97. The defendant's president, Mr. O. F. Mayfield, testified that none of the expenses claimed by plaintiff had been specifically assumed by defendant and that defendant had performed its obligations to plaintiff.

The opposed auditors had the same records before them and the difference in their respective figures of $14,622.92 resulted (except as to one error of addition made by plaintiff's auditor) from the adoption of conflicting assumptions as to the rights of the parties in respect to certain items. The master and the trial court concluded generally that defendant's audit was correct and that plaintiff's audit was incorrect.

The plaintiff's audit included seven groups of items for which plaintiff claimed he was entitled to recover, and defendant's audit excluded them because defendant denied liability in respect to them. Their nature is explained in the evidence and plaintiff contends as to each of them that the conclusion of the trial court against him was clearly erroneous.

### Opinion.

*The Commissions.* (1) Plaintiff's auditor figured plaintiff's commission on

his sales of "admix" at the rate of commission provided in the contract. The answer of the defendant contained the allegations that "all payments were made in accordance with the terms of the contract" and that such payments were shown in the exhibits attached to the petition which were the monthly statements rendered by defendant to plaintiff. But on the hearing before the master, defendant introduced a letter written to it by plaintiff proposing a change from the contract rate of commissions on sales of admix, slightly reducing the rate, and defendant's president Mr. Mayfield testified that plaintiff's proposal was accepted by a letter dated some two weeks after the proposal. This letter was in the handwriting of Mr. Mayfield, written in lead pencil on a blank sheet of paper, and in response to the question, "Mr. Mayfield, did you mail this letter?" he answered, "Why, I suppose the bookkeeper did. I don't remember whether I mailed it or not. I imagine he did. It was put in an envelope. I would say yes." The bookkeeper testified at length, but did not claim to have mailed or delivered the letter to plaintiff. The plaintiff denied that he had ever received the letter or that a change in the contract rate of commissions on admix had been agreed to. The master and the court found against the plaintiff on this issue, but the court's opinion based the conclusion in part upon its finding that "all monthly statements made [after the date of Mayfield's letter] [1] were rendered in accordance with the terms of the letter and not in accordance with the terms of the contract as originally signed", and that "The parties operated under the letter as a modification of the contract." The monthly statements do not of themselves show what the basis of computation was because they do not give the prices F. O. B. at the mill, but such prices are disclosed by comparing the statements with the more detailed accounts of defendant's auditors which are brought up with the record. On such examination, it appears that many admix commission items in the monthly statements were computed in accordance with the terms of the contract as originally signed, and there was no entirely consistent course of computing the commission in the monthly statements or disclosure therein sufficient to establish notice to plaintiff of the alleged change in the contract. The bookkeeper who prepared

and mailed the monthly statements admitted that he had not consistently computed them in accordance with the terms of Mr. Mayfield's letter but had made a mistake through failure to check with the letter. The fact that he had included some computations on the basis of the letter demonstrates that he knew of the letter and that it was in the company's office. It appeared that Mr. Mayfield had on two other occasions written lead pencil letters to plaintiff but no copies of such letters were found in the office and Mr. Mayfield did not testify that he made or caused to be made any copy of the lead pencil letter here in question. It is probable on the evidence that Mr. Mayfield wrote the letter at or about its date and that it came to the hands of the bookkeeper, but the record discloses nothing to charge the plaintiff with knowledge of it. In view of the defendant's pleading, on which the case was referred to the master, the absence of any request to amend the pleading, the insufficiency of proof that Mr. Mayfield's letter was mailed to plaintiff, plaintiff's sworn denial of the receipt or knowledge of it, and the entire absence of any circumstance throughout the record to charge him with knowledge of it, we are constrained to hold that the finding that the contract commission rate was changed was clearly erroneous. Plaintiff was entitled to have his commissions computed at the contract rate as pleaded by both parties and to recover on the accounting as commissions $1,711.24 more than the amount shown by defendant's audit.

(2) A difference between the audits resulted on account of conflicting interpretations of paragraphs 4 and 5 of the contract above set forth. Plaintiff was entitled to receive commissions on all accepted orders whether received by the company from customers by direct address to the home office, or through the plaintiff, but the contract excepted "business received from our [the corporation's] [2] present dealers" from the business on which commissions were to be paid. Plaintiff contended that the exception referred only to business from "dealers" in the sense of persons who bought from the defendant for the purpose of resale. Defendant contended that the "present dealers" included all of those who had established dealings with defendant by purchasing its

---

[1] Interpolated.

[2] Interpolated.

products. The trial court held: "I am of opinion that the parties meant to and did exclude from the operation of the contract all business from the trade that had been established by the defendant prior to the date of the contract and that orders received from old customers * * * were excluded from the contract." Consideration of the arguments of counsel and the evidence have not persuaded that the ruling of the trial court on this point was erroneous.

▬ (3) Plaintiff's audit shows the plaintiff entitled to commissions in the amount of $4,572.32, resulting from shipments of defendant's products to various dealers on consignment. Such shipments were made pursuant to plaintiff's solicitations but admittedly he was not entitled to commissions on account of them unless and until the goods were sold and paid for. The defendant did not keep a separate consignment account showing the amount of consigned product in the hands of each consignee or the amount disposed of by each. The monthly statements showed a total of 1078.7 tons shipped on consignment and such statements specified commissions accrued and paid upon only 98.4 tons of such consigned product. Plaintiff's accountant therefore set up in his audit as commissions due the plaintiff in addition to the specific commissions shown on the monthly statements, all of the commissions that would have accrued on the sale of the consigned shipments. In making up the defendant's audit defendant's auditor and bookkeeper made search for the invoices of the shipments which had been made from the places where the product was stored under the consignments, computed commissions thereon, and in that way defendant's audit accounted to plaintiff for his commission on all such shipments except as to a relatively small amount of some 149.46 tons which may have remained unsold or may have been lost in shipment or storage.

Defendant's accountant made no effort, however, to connect up or reconcile the commissions thus computed in respect to consignment items with the monthly statements or to find out whether any commission payments shown on the monthly statements were in fact related to the consignment shipments.

Defendant's pleading was that its payments to plaintiff were shown in the monthly statements and as they showed no pay-ments on consigned shipments, its proof did not sustain its pleading. On the other hand, the consignment shipments were undoubtedly made by defendant at the solicitation of plaintiff to dealers secured by plaintiff, and the failure of such dealers to make reports of the sales or stocks on hand prevented defendant's bookkeeper from keeping any accurate consignment acount. The method of tracing the sales of the consigned product through the invoices, which showed the shipments made from the points where the consigned product was stored, was the best method left to the accountants to ascertain and show the commissions earned by plaintiff in respect to the consigned shipments. Though the results concerning consignment shipments produced by the method of plaintiff's auditor were admissible under the pleadings, such results were shown to be unjust to defendant and the court did not err in refusing to sustain plaintiff's audit in respect to consignment shipments or to award plaintiff the sum of $4,572.23 for commissions on the consigned product.

▬ (4) But there was also a conflict between the two audits in respect to the total commissions that had been paid the plaintiff. Plaintiff's audit showed that plaintiff had been paid a total of $11,590.-16 on account of commissions earned, and defendant's audit showed that he had been paid $13,863.10, the difference being $2,-272.94. Plaintiff's accountant arrived at the amount of the commission payments from the monthly statements and his audit in this respect was in accord with the monthly statements. Defendant's accountant and bookkeeper reached their total of commission payments by simply adding up all of the cashed checks which defendant had issued to plaintiff. The plaintiff's audit conformed to the allegations of defendant's pleading that defendant had made its commission payments to plaintiff as shown in the monthly statements, but the master disregarded the pleading and treated all checks received by plaintiff as payments on commissions, without requiring proof of the check stubs or otherwise as to what 'the checks were issued for. It thus appears that in respect to both the consigned shipments and the commission payments the conclusions of the master in defendant's favor were based on defenses not pleaded by defendant. The state of the pleadings was called to the master's attention by proper objections made by

plaintiff and the master probably had no authority to permit amendments to be made. At least there was no attempt to make any. Rules 15, 53, Federal Rules of Civil Procedure.

As defendant did not establish that the commissions shown to be due the plaintiff on the monthly statements were the same commissions accounted for in defendant's audit of the consignment shipments, and as defendant did not plead or prove that all checks issued to plaintiff were commission payments, it was clearly erroneous to deduct from commissions due plaintiff both the $4,572.23 commissions on consignment sales and the $2,272.94 excess of checks over commission payments shown on the monthly statements.

It was not necessary for defendant to show the relation of each of its checks to particular sales made by plaintiff, but having found checks not related to the monthly statements and traced out consignment sales not identified on the monthly statements, it was manifestly incumbent on defendant to supply some explanation of the discrepancies between the account sent to plaintiff and pleaded by defendant and the substituted account offered in evidence. The contract contemplated that expenses incurred by plaintiff might be assumed by defendant, and it is shown that some checks were issued by defendant under those provisions of the contract, and it is compatible with the record that some checks were related to sales of consigned product not shown on the monthly statements. It was the opinion of the trial court that "certain checks were given plaintiff from time to time for travel allowances and for other purposes", but the court concluded that the overpayment to plaintiff of $436.97 shown in defendant's audit would more than account for whatever checks were not paid directly on commissions. We are unable to reconcile such conclusion with the pleadings or the evidence.

As we find no basis in the record to allow defendant for payments which it did not plead or clearly establish, we conclude that the decree should be modified by adding to the amount shown due plaintiff on defendant's audit the sum of $2,272.94 and awarding that amount to plaintiff.

(5) A further difference between the two audits results from the fact that the defendant's accountants did not include commissions which accrued to plaintiff under the terms of the contract between January 9, 1938, and the date of the commencement of the suit, amounting to $740.-05, or between that date and the date of the audit, July 15, 1939, amounting to $2,-709.72. Plaintiff's auditor included commissions for both periods.

It appears in evidence that plaintiff continued to make sales after January 9, 1938, and up to the time the suit was brought. He was given credit in defendant's audit for commissions on sales so made by him personally, but was denied credit for "accepted orders received from customers by direct address to corporation's home office" as provided in the contract.

Again reverting to the pleadings. The defendant did not allege in its answer that the contract of employment sued on had been mutually rescinded or terminated. Its term was five years, provided plaintiff continued to produce a specified amount of business and there was no pleading that the contract had expired by its limitations. But on the hearing before the master the defendant offered and the master received testimony intended to prove that the contract had been mutually rescinded by a request on the part of the plaintiff to be released from it and a compliance with the request and release granted by defendant on January 9, 1938. Plaintiff's version of the transactions was to the effect that an attempt was made by plaintiff, defendant and others, to organize an association of silica producers, of which plaintiff was to be the secretary, and it was agreed between plaintiff and defendant that if the organization was perfected, and if he became secretary, he would be released from the contract. The organization was not perfected and no rescission of the contract was mutually agreed upon.

Although the claimed rescission of the contract was not pleaded and neither the master nor the trial court made a finding that it had occurred, we have examined the evidence relating to the issue and are not persuaded that the contract was rescinded on January 9, 1938. The evidence was that defendant continued to send monthly statements to plaintiff up to and including November 1, 1938, and plaintiff continued his efforts to make sales. It follows that the elimination from defendant's audit of the commissions earned by plaintiff under the contract in the amount of $740.05 was not supported by the plead-

ings, evidence or finding and was clearly erroneous.

The claim for commissions according to the contract after the suit was filed will be discussed in connection with the claims for damages.

(6) A difference between the two audits of $87.11 is attributable to the fact that defendant employed two salesmen who produced some business in respect to which defendant's audit allowed plaintiff only $1 per ton as his commission. His contract entitled him to the rate of commission above set forth "on all accepted orders" and this deduction of $87.11 was clearly erroneous.

(7) It appears that the railroads on occasion made freight overcharges and that such overcharges were charged against plaintiff's commissions. Some refunds of such overcharges were subsequently obtained by defendant. One-half of the amount of refunds, $232.88, was allowed to plaintiff on defendant's audit. Plaintiff insists he should have had all of the refunds. But the record does not identify the refunds with particular charges made against plaintiff's commissions and we cannot say the ruling against plaintiff was clearly erroneous or that defendant was not entitled to retain some part of the refunds.

Our conclusions on the seven points made against the decree sustaining defendant's audit requires that the decree be modified by adding to the amounts shown to be due plaintiff by defendant's audit the item of $1,711.24; the item of $740.05; the item of $87.11, and the item of $2,272.94. The items total $4,811.34, leaving the amount for which plaintiff should recover in respect to commissions, after deducting the overpayment shown by defendant's audit, $4,374.37.

*Expenses.* Plaintiff made claims on account of his traveling, hotel and investigation expenses in the aggregate amount of $1,568.50, and both plaintiff and defendant's president gave testimony on the issue. That of the plaintiff tended to establish that the expenses were incurred at the express direction of Mr. Mayfield and as to some of them that Mr. Mayfield expressly promised reimbursement by the company. But he was contradicted by Mr. Mayfield. The terms of the contract required the plaintiff to establish that the company had specifically assumed an item of expense before he could recover it back, and in view of the conflict of testimony it cannot be held that the denial of these claims by the trial court was erroneous.

*Status of Contract.* Plaintiff's prayer for alternative relief on account of his loss of the benefits of his contract presents difficult questions not directly considered or answered by the trial court.

The term of the contract was five years, if plaintiff produced the required volume of business each year, and it was clearly proved that during the first two years plaintiff fully met the requirements. During that period he obtained government approval of defendant's admix for use on government work, established some twenty new dealers in the product, and in each of the years sold considerably more than twice as much of defendant's product as defendant's total sales had amounted to in the year prior to his employment. Plaintiff spent several thousand dollars and his time in these efforts and the defendant derived advantages of a continuing nature from them. It is also manifest from the contract itself that the parties contemplated that the plaintiff might build up a valuable interest under the contract as is shown by the quoted provisions concerning arbitrary cancellation. But on January 9, 1938, defendant sent plaintiff a telegram to the effect that it was releasing him from "any contract he may have with Corona Products", and if defendant had stood upon the telegram as a discharge of the plaintiff and cancellation of his contract, there would be little doubt that defendant would have become liable for the damages stipulated in the contract in the case of "arbitrary cancellation" because, as we have found, no sufficient cause for discharge then existed. But as has been stated, no issue of discharge or cancellation as of that date was pleaded. On the other hand, there is serious question of defendant's cooperation with plaintiff after the date of its telegram.

The trial court considered plaintiff's claims for damages on account of defendant's alleged failure to cooperate, and concluded, "The testimony does not show any failure on the part of the defendant to cooperate in every possible way with the plaintiff. On the other hand, the testimony discloses that the plaintiff undertook to direct the affairs of the defendant and soon after the contract was signed began

insisting that defendant make changes in the operations·and that a product different from that which was being manufactured at the time the contract was signed should be made by the defendant. * * * the contract did not require the defendant to make any structural changes in the mill."

The conclusions as to plaintiff's conduct are borne out by the evidence. We think it clear that plaintiff was at fault in calling upon defendant to do more than it was obliged to do under the contract and that he overreached himself and his resources in his endeavors to expand the business.

But such faults were not dishonest acts and defendant met them by refusing to comply with the excessive demands. It went far in cooperating when it permitted a thousand tons of its product to be shipped on mere consignment and when it paid the expense of a traffic expert to figure traffic rates so that prices at points of delivery could be quoted and when it telegraphed money to plaintiff, paid for some of the expenses incurred, and made him advancements. Its president accompanied plaintiff on some of his trips in search of new business. During the period up to January 9, 1938, it cooperated as the court found.

After January 9, 1938, however, such acts of cooperation ceased, the plaintiff was unable to keep up his office in Washington and moved it to residence quarters in St. Louis, and his sales and commissions fell off to a small fraction of what they had been during the preceding period. Though defendant's telegram of that date was not thereafter treated by it as an absolute discharging of the plaintiff and plaintiff did not so treat it, defendant must have intended that it should, and it undoubtedly did, discourage the plaintiff and cut off any hope on his part of further cooperation by defendant such as had been given him. It was evident at the time of the hearing that the relations between plaintiff and defendant's president were strained to the point that the cooperation which had given value to the contract had ceased. The conditions of cooperation under which plaintiff was to receive commissions on "all of defendant's accepted orders" no longer existed and the court did not err in refusing to allow him commissions on such business up to the time of the audit on July 15, 1939, being the item referred to in (5) supra.

On the other hand, the court was clearly in error in failing to distinguish between the cooperation up to January 9, 1938, and the lack of it after that date, or to give consideration to plaintiff's claim for compensation in some form in respect to his loss of the benefits of his contract after the time to which his commissions are allowed. The contract was not cancelled but was subsisting all of the time defendant continued to make its reports to plaintiff, and defendant had the continuing benefit of the expanded business from plaintiff's expenditure of his time and money.

 The contract was an Arkansas contract to which the law of that state was applicable. The Supreme Court of the State recognized and discussed the difficulties and declared the law in a situation analogous to that presented by the facts in this case by its opinion in Spencer Medicine Company v. Hall, 78 Ark. 336, 93 S.W. 985, 988. There an award of $500 for loss of profit reasonably to be expected from a commission contract deemed terminated by the conduct of the employer was sustained. The court said: "When, as in this case, there is a breach of a contract in which the parties expressly contracted for the earning of profits·by way of commission on sales of goods to be made by the agent, they must necessarily have had in contemplation the loss of such profits as an element of damages upon breach of the contract." It is clear under the decision that it is not necessary for one employed under a commission contract to prove that his employer has formally discharged him in order to maintain an action for lost profits. It is sufficient to show that the employer has by words or conduct plainly evinced an intention not to perform. Taking into consideration defendant's telegram of January 9, 1938, the course of the business subsequent thereto, defendant's pleading that it had requested plaintiff to cease holding himself out as defendant's representative and all the circumstances shown in evidence, we conclude that defendant plainly evinced its intention not to perform the contract. Plaintiff's obligations under the contract were such that his reasonable expectation of profit from it at the time to which we have allowed him commissions under it (November 1, 1938) was obviously greatly reduced. Nevertheless, the termination of it must be attributed to defendant. Defendant's conduct, taken as a whole, must be deemed a breach, and we

think that the court below should have made an award to the plaintiff on account thereof, and that such award should not have been less than the sum of $250. We therefore fix that as the sum which should have been awarded by the trial court for the breach of the contract.

The trial court found that the defendant was not entitled to recover on its counterclaim and we are in accord with that conclusion.

■ Plaintiff showed the reasonable value of the services of the accountant employed by him to be $600 and requests that the amount be allowed as costs. But we are cited to no statute or rule authorizing such allowance and deny the request.

All other contentions have been considered but need not be discussed.

The decree appealed from is reversed with direction to enter a new decree awarding recovery to plaintiff against defendant in the sum of the above items found due plaintiff, less the overpayment shown by defendant's audit, such total to be awarded being $4,624.37. No interest may be added to the items, but the decree shall draw interest according to law.

Reversed with directions.