In re PUBLIC LEDGER, Inc.

No. 21904.

District Court, E. D. Pennsylvania.

Nov. 19, 1945.

Hirschwald, Goff & Rubin and David Rosen, all of Philadelphia, Pa., for trustees.

Axelroth & Porteous and Harry R. Axelroth, all of Philadelphia, Pa., for Typographical Union.

M. H. Goldstein, of Philadelphia, Pa., for sundry members of Newspaper Guild of Philadelphia and Camden and for Newspaper Guild of Philadelphia and Camden.

Before KALODNER, BARD, and GANEY, District Judges.

GANEY, District Judge.

This is a petition for review involving certain claims for severance pay, discharge pay, and vacation pay.

Public Ledger, Inc., had a contract with the Newspaper Guild of Philadelphia and Camden dated December 23, 1940, which was to remain in effect until July 31, 1941, with the proviso that at least sixty days before its expiration, notice should be given by either of the parties for any alteration or extension of the contract subsequent to that date. Provision was made in Section 21 thereof for severance pay [1].

On February 3, 1941, a contract was entered into between Public Ledger, Inc., and the Philadelphia Typographical Union No. 2 to run for a period of two years, the 19th article of which contained a severance clause [2] and the 9th clause a provision for vacation pay [3].

---

[1] "Severance Pay. The Ledger shall pay immediately to any employee to whom this contract applies, who is discharged, except an employee who deliberately provokes his discharge in order to obtain severance pay, or an employee who is required to be discharged because of failure to maintain good standing in the Guild, a sum of money in cash equivalent to:" and then recites the number of weeks' pay to be given to the employee varying with the length of service with the paper.

[2] "Two working days' notice before the end of the fiscal week shall be given a situation holder before being laid off".

[3] "Vacations: Beginning with the calendar year 1941 vacations with pay

On March 10, 1941 an ·agreement was entered into between Public Ledger, Inc., and Philadelphia Mailers Union No. 14, Section 6 [4] thereof providing for vacation pay.

With respect to the Guild contract, notice was given on May 28, 1941, by the Guild of its desire to negotiate a new contract, which, if adopted, would effectuate extensive alterations in the one about to expire. There were meetings held between representatives of the Ledger and the Guild looking forward to changes in the contract including consideration of a proposal to permit the Ledger to dismiss for reasons of economy, fifteen percent of the Guild members in its employ, as the Ledger had been operating at a loss for a number of years, amounting for the year 1940 to approximately one half million dollars. At a meeting of the parties on July 29, 1941, two days prior to the expiration of the contract, the parties orally agreed to extend the contract until August 14, 1941. The contract was extended at the expiration of this date until August 22nd and then extended to August 29th. At a meeting held on August 25th between the Negotiating Committee and the Ledger representatives, the Ledger made a complete statement of the changes it desired in the whole contract. On August 26th, Mr. Robert Cresswell, publisher of the Ledger, advised the Guild that the Ledger would not extend the contract beyond August 29th unless the Guild agreed to delete a section, which provided that no dismissals for the purpose of economy could be made by the Ledger, without the consent of the Guild, and further that, in the event this condition were agreed to, all other provisions of the contract would be extended to such a period of time, as might be necessary to agree upon the balance. This was rejected by the Guild and on the 28th a written proposal was made by the Ledger that the Guild permit the Ledger between that date and October 15, 1941, to discharge a maximum of thirty-one of its members, and further providing that if these conditions were consented to, the contract could be extended for whatever further period was necessary to conclude negotiations. The Guild on the same date agreed to this proposal of the Ledger with the provision that between that date and October 15th the Ledger present to the Guild the names of the persons they proposed to discharge, and that if the Guild would not agree to their discharge, an arbitrator was to be appointed to pass on the propriety of the discharges. This provision was acceptable to the Ledger. No further meetings were held until September 9th and at that meeting as well as on those of the 12th, 18th and 20th, the subject under discussion concerned itself almost entirely with the propriety of the discharge of the individuals specified by the Ledger. At a meeting on September 25th the discussion of changes in the contract proposed by the parties was resumed, and as has been indicated with the exception of August 25th, there had been no discussion of changes in the contract itself since July 29th. No agreement having been reached with respect to the dismissals, arbitration was initiated on September 29th, and in pursuance thereof six hearings were held up to, and including, October 28th. At the arbitration hearings, discussions looking toward amendments of the contract were had. On November 4th, the Guild by letter [5] covering meeting of October 21, 1941, rejected the proposed contract submitted by

in advance shall be given on the following basis: (a) Employees who have held situations during the entire previous calendar year shall be entitled to two weeks' vacation (ten days with pay) during the next calendar year".

4 "Section 6. Vacations—Beginning with the calendar year 1941 Journeymen who have worked regular situations during the entire previous calendar year shall be entitled to one week's vacation with pay, with the provision that a substitute must be hired to work for the Journeyman on vacation, such substitute to be paid by Employer. Should such regular Journeymen, working regular situations be layed off on account of a temporary reduction in force, such regular situation Journeymen shall be entitled to one day's vacation with pay for each fifty-two (52) days worked in the preceding calendar year. The vacation schedule shall be arranged by the office between May 1st and September 30th. The days of the vacation shall be consecutive. Vacations shall be scheduled with due consideration to priority, by mutual agreement between the individual member and the Foreman".

5                    "November 4, 1941
"Mr. Robert Cresswell, Publisher,
"Evening Public Ledger,
"7th & Chestnut Streets,
"Philadelphia, Pennsylvania.
"Dear Mr. Cresswell:
  "The Ledger unit at a meeting Tuesday, October 21, attended by more than 100 members, voted 67–10, to reject the

the Ledger pending negotiations of certain provisions including hours of work, minimum wages and pay increases. On the same date, November 4th, Mr. Cresswell of the Ledger sent to the Guild a letter containing inter alia, "That the unit which you represent has definitely refused to accept the proposals last made at a meeting held on October 21, 1941. Such being the case you are hereby notified that the contract, expiring by its terms July 31, 1941, is no longer effective or binding upon us and we recognize no responsibility thereunder". This letter was received on November 6th and on the same day, not being able to reach Mr. Cresswell, the Guild chairman dictated over the telephone to Mr. Cresswell's secretary the following: " * * * The Guild could not accept his unilateral termination of the existing contract * * *".

On November 7th, 1941, the Public Ledger, Inc., filed its petition under Chapter X of the Chandler Act, 11 U.S.C.A. § 501 et seq. The court entered an order [6] appointing trustees who were directed "to manage, maintain and operate" the business for a period of six days from the date of their appointment. Further order [7] were made

on November 13, December 12, December 17, December 29, continuing the operation of the paper for 30, 5, 12, and 7 days in succession.

On January 5, 1942, the court ordered a discontinuance of the operation of the paper by the Trustees. All current wages incurred by the Trustees between November 7, 1941 and January 5, 1942, have been paid as were all wages incurred by the bankrupt in the course of its operation until November 7, 1941, the day on which the petition was filed.

### Severance Pay

It is the contention of the claimants, whose claims total $223,528.20, that (a) the contract entered into between the Guild and the Ledger on December 23, 1940, was in existence as of November 7, 1941, the date of the filing of the petition under Chapter X of the Chandler Act, and that the same was assumed and adopted by the Trustees during the period of their operation of the paper under the supervision of the court and that on January 5, 1942, when the paper was discontinued by order of the court, they were discharged by the Public Ledger, and that accordingly they are entitled to

proposed contract pending negotiation of improvements in these clauses:

"(1) (To Whom Applicable) The unit wishes to eliminate some of the exceptions asked by management.

"(4) (Hours of Work) The unit wishes to eliminate some of the exemptions asked by the management from the five-day, 4-hour week.

"(14) (Minimum Wages) Improvement in scales.

"(16) (Pay Increase) Flat increase asked by unit.

"(18) (Temporary Employes) The unit feels that the use of temporary employes in all departments should be restricted.

"(22) (Expenses) $10 for photographers' expenses instead of $7, and for district reporters who are required to use their automobiles.

"The unit also wishes management to present an improved scale for masking artists.

"Very truly yours,
"Max Ways, Chairman, Ledger
"Negotiating Committee".

[6] "Section 6: That the Trustees herein be, and are hereby authorized and directed, pending further order of this court, to manage, maintain and operate, and to keep in proper condition and repair, assets and property of the debtor, wherever situated; and to manage, op-

erate and conduct the business of the debtor and to this end to exercise its authority and franchises and discharge all duties obligatory to it; and to employ and/or discharge, and fix the compensation of all employees; and to collect and receive the income, rents, revenues, royalties and profits of said assets, properties and business; to collect all outstanding accounts; to continue until further order of this court the business of the debtor for a period of six (6) days from the date of this appointment; to wit, until the close of business on Thursday, November 13, 1941, making purchases of supplies and sales of products in the regular course of business; paying current wages, all according to law and subject to such supervision and control by this Court as the Court may exercise by further orders applied for herein".

[7] "That the Trustees shall continue, until further order of this Court, the business of the Debtor, for a period of —— days from the date of this decree, to wit, until the close of business on ——, making purchases of supplies and sales of products in the regular course of business; paying current wages, all according to law and subject to such supervision and control of this Court as the Court may exercise by further orders applied for herein".

severance pay under section 21 of the Guild contract and that those under the Typographical Union Contract are entitled to two days pay under section 19 thereof, and (b) that this severance pay has the status of wage claims and as such is entitled to priority under section 64, sub. a (2),[8] of the Bankruptcy Act up to $600. If the claims are allowed this status, the rights of priority urged aggregate $108,123.09, and if the claims are not given the priority of wage claims, claimants argue (c) that their claims should be classified as wages earned during the operation of the business by the trustees and as such are costs of administration to be paid in full[9].

The broad question here posed is whether the Referee, in an extremely well considered opinion, erred in denying the claims by the Unions on behalf of their employees for severance and vacation pay. More particularly, the first question to be disposed of is whether or not the contract of the Newspaper Guild of December 23, 1940, and that of the Typographical Union of February 3, 1941, was in force and effect as of the date of the filing of the petition under Chapter X of the Chandler Act, November 7, 1941, and if so, whether or not the contract was assumed and adopted by the Trustees in the operation of its business until its close on January 5, 1942.

The instant case demonstrates the difficulties which are likely to arise when Trustees in bankruptcy fail to expressly adopt or reject executory contracts as expediently as possible. The Referee found that the contract was in existence as of November 7, 1941, but that the Trustees neither accepted nor rejected it during the course of the operation of the business, and hence no right to severance or vacation pay could properly arise.

█ It may be noted that Section 70, sub. b, of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. b, which provides for the automatic rejection of contracts not otherwise acted upon by the Trustees, within sixty days, does not come into play, for the reason, as pointed out by the Referee, the order of liquidation was made on January 5, 1942, whereas the proceedings were begun on November 7, 1941, a lapse of only fifty nine days.

█ In determining whether the contract was in existence on November 7, 1941, at the time of the filing of the petition under Chapter X of the Chandler Act, due consideration must be given to Cresswell's letter of November 4, 1941, addressed to the Chairman of the Negotiating Committee of the Newspaper Guild in which they were notified that the Ledger no longer considered the contract binding. The Referee decided that Mr. Cresswell's letter was ineffective to terminate the contract, since his refusal to be bound was predicated on the refusal alleged in the letter of the Guild "to accept the proposals last made at a meeting held on October 21, 1941". The Referee found that the Guild had not refused to accept the contract but merely suggested certain matters for further negotiation and that there was no warrant for the position taken by Mr. Cresswell, and hence the contract was in effect as of November 7, 1941. It is apparent that the Referee's conclusion is valid only if a finding is made, that Mr. Cresswell intended his renunciation to be effective, if the Guild had refused to continue negotiations, or if he was correct in assuming that the Guild had refused to continue negotiations. It is patent, however, that there was no such intention. The letter was a categoric refusal to recognize the contract, and the fact that Mr. Cresswell erred in the basis for his rejection does not make his act any less a breach. If there was no justification for his act, it constitutes an anticipatory breach, and since the Guild rejected his act, it had a right to (a) sue immediately, or (b) wait until an affirmative act, such as the refusal to perform a contract term occurred. 5 Williston on Contracts, § 1337. In taking the latter course, the Guild would leave the contract in effect, thereby making itself subject to the terms of the contract

8 "The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be * * * (2) wages, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding, due to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the bankrupt; * * *." 11 U.S.C.A. § 104.

9 "The debts to have priority * * * shall be (1) the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition; * * *." § 64, sub. a(1), 11 U.S.C.A. § 104.

should Cresswell decide to perform. Since there was no suit on the contract before November 7th, and no act other than the anticipatory breach, there can be no doubt that the contract was in effect until November 7th. Therefore, though reasoned differently, the same conclusion is reached here, as the Referee did.

In the disposition of these claims it must be borne in mind that the commencement of bankruptcy proceedings constitute an anticipatory breach of an executory contract. Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811, L.R.A.1917B, 580; 3 Williston on Contracts, § 2476. Accordingly, the employees on November 7, 1941, could have stopped working and elected to treat the bankruptcy as a breach unless the contract was expressly assumed by the Trustees. Instead they elected to continue working, thus consenting to the breach. It is not the rule that the contract is binding until rejected, but in order for the Trustees to be bound, they must positively indicate such intention. The Trustees are not bound until they have affirmed the contract and assumed its direction. Pacific Western Oil Co. v. McDuffie et al., 9 Cir., 69 F.2d 208, 213; 4 Collier, Bankruptcy, 14th Ed., 570.43, p. 1231.

In support of the contention that the Guild contract was assumed by the Trustees, it is pointed out by counsel for the Guild that during the conduct of the business the provisions of the contract were complied with; that Guild dues were deducted from the wages of Guild members; that no attempt was made to effectuate the desired "economy firings" in the absence of the Guild's consent; that no reduction was made in the wages of the Guild employees, or in the overtime payments stipulated by the contract; and that furthermore, at a meeting of the Trustees and the Guild Negotiation Committee, the latter objected to Mr. Cresswell's letter of November 4th, and the Trustees took the position that they "could not either withdraw or affirm Mr. Cresswell's letter; that they could not pass upon its validity, but that they were acting and would continue to act to enforce all of the terms and conditions of the contract as if no dispute existed between the Guild and the Trustees, or former Ledger management, rather as to the validity of Mr. Cresswell's letter of November 4th". While these considerations can not be brushed aside lightly, they are by no means controll-

ing. The fact that the Trustees did not expressly reject the Guild contract does not constitute an assumption of it. The fact that the Trustees did not attempt to effect economy firings without Guild approval does not necessarily mean that the Trustees considered themselves bound by the contractual provision to that effect. More likely, a studied consideration of the whole period in which they operated reflects the realization, on their part, that any other method of accomplishing a reduction in the number of employees would result in interruption of the business, thereby defeating the aims of the reorganization. The statement by one of the Trustees on November 11th that they would "continue to act to enforce all of the terms and conditions of the contract" while as has been indicated lends some support to the theory of assumption especially when taken in connection with the Guild's contention at the time that it "could not very well enter into the cooperation which the Ledger sought from it, in the absence of a contract", yet it must be noted that at the outset of the meeting at which the statement was made, the question which attracted the attention of the parties was not whether the Trustees assumed the contract, but whether Mr. Cresswell's letter of November 4th terminated the contract, an event occurring before the proceedings were instituted, and so when laid against its proper background it is conclusive of nothing one way or the other. It is evident from the testimony of Mr. Way, the Guild Negotiation Committee Chairman, and Mr. Warthman, one of the Trustees, that the Trustees were reluctant to do anything with the contract lest the reorganization be impeded or given up, because of labor difficulties. In addition they were attempting to keep in balance a delicate situation, for what they knew must be a short period of time, for uppermost in their minds was the hope for a favorable sale of the business, to a valid purchaser. Likewise, it is apparent that the Trustees also had in mind the wisdom of assuming a contract which might give rise to large claims for severance pay, and in addition they undoubtedly considered their power or lack of power to assume such a contract, especially having in mind the nature of the decrees which the court authorized for the continuation of the business for such very short intervals. It is obvious that in the minds of the Trustees the serious objection to the contract from their point of view was the severance pay provi-

sion, and their dissent to it was apparent from the beginning. At most, it can only be said that an assumption, if any, was experimental, and there is authority to the effect that Trustees conducting a business under Chapter X may ride along on a contract for a short time on an experimental basis to determine whether it would be advantageous to the estate to assume it. Butterworth v. Degnon Contracting Co., 2 Cir., 214 F. 772; Menke v. Willcox, D.C., 275 F. 57; Pacific Western Oil Co. v. McDuffie, supra.

■ Again, it seems to us that claims for severance pay must of necessity be conditioned upon the continuance in business of the employer or his successor. This condition must be implied as a necessary prerequisite to the continued existence of a severance-pay contract. The bankruptcy of Public Ledger, Inc., was not a breach of the contract but rather a failure of a condition impliedly agreed upon, namely, that the provision was to remain in force only so long as the Ledger remained an operating business. If the claimants are to sustain their position, that they are entitled to severance pay, the contract must be interpreted as not only an agreement that the employer would grant the employees severance pay on discharge, but also a warranty by it that it would stay in business, for as long as these employees would wish to work for it. However, a more reasonable interpretation and its true intent, it seems to us, is that the employer and employee agreed that so long as business conditions warranted the continuance of the employer in business, the employer would retain the service of the employees, and if the employer discharged an employee during this time for any reason not excepted by the contract, it would be subject to a penalty payable to the discharged employee. In re Specht, D.C.Pa., 46 A.B. R., N.S., 123.

■ Furthermore can it be said that the claimants were "discharged" by Public Ledger, Inc., or the Trustees on January 5, 1942, as provided in Paragraph 21 of the Guild contract for severance pay? To discharge an employee is to remove him temporarily or permanently from employment. Markey v. Pickley, 152 Iowa 508, 132 N.W. 883. In order that there be a discharge by the employer, there must be some affirmative action taken by the employer. There must be some conduct on the part of the employer, indicating that he will no longer

be bound by the contract of employment. Miller v. Abraham, 159 Ark. 493, 252 S.W. 15. There must also be an intention on the part of the employer to abrogate the contract, and there must be some communication of that intent by word or act to the employee. Helfer v. Corona Products, Inc., 8 Cir., 127 F.2d 612. It seems to us that a fair consideration of the cases shows that the law requires some affirmative act on the part of the employer, as where the employer sells, leases or merges his business, in which instance the courts apparently consider this to be an affirmative act, showing an intent to terminate the employment. White v. Lumiere North American Co., Ltd., 79 Vt. 206, 64 A. 1121, 6 L.R.A.,N.S. 807. It should be noted that in those cases where the courts spelled out a discharge from the sale, lease or merger of a business, the issue involved was the wrongful termination of a contract of employment for a fixed period and not a severance agreement. Here, even if we hold that the contract was in effect, and assumed and adopted by the Trustees, it is exceedingly difficult to work out a discharge of the employees by the Trustees. They themselves, did nothing. The termination of the business was by order of the court for the best interests of all parties concerned, and the termination of the employment relationship, therefore, was by the act of the court, not by any act of the Trustees which could be construed as a discharge.

■ Again, as has been pointed out by the Referee, the character of the supervision of the Trustees, and their right to operate, is very obvious from the limited periods of time for which extensions were granted by the court. The authority contained in the initial order directed the Trustees "to manage, maintain and operate * * * manage, operate and conduct the business of the Debtor * * * all according to law and subject to such supervision and control of this court as the court may exercise by further orders applied for herein" makes it impossible to believe that the court, in view of this limited direction to the Trustees to operate, as evidenced by the short periods of time granted, and in the light of the great obligation which would be imposed upon the estate by an adoption by the Trustees of the Guild contract and the severance clause therein, should have intended the Trustees to exercise such broad power without previous court approval. In view of this it would

1016

seem, even had the Trustees adopted the Guild contract, it would have been invalid because it lacked an order of the court authorizing the same. Erie Malleable Co. v. Standard Parts Company (In re Younger), 6 Cir., 299 F. 82.

■ It is also contended for the claimants that if we assume the contract to have been adopted by the Trustees during the operation of the business from November 7, 1941, to January 5, 1942, and if we further assume that there was a discharge by the Trustees within the meaning of Article 19 of the Typographical Union Contract, this severance pay would be entitled to priority in distribution because it is a cost of administration of the bankrupt estate within the provisions of Section 64, sub. a(1), which creates a priority for debts arising from the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition. Claims for administration expenses must fall clearly within the meaning of the act. In the light of the limited authority given by the court to the Trustees in the instant case, the first leave being to continue the business for a period of only six days and other subsequent grants of authority for its continuance for like short intervals, we could not allow the severance pay and lay off pay as provided in the respective contracts as a cost of administration, in view of the fact that the Trustees had not received express authorization from the court to incur this obligation.

■ It is likewise contended that if we make the assumptions hereinabove made with reference to the continuation of the contract during the period of operation by the Trustees and the effect of the term "discharge", that these claims are entitled to preference as wages within the provisions of section 64, sub. a(2), of the Bankruptcy Act up to the sum of $600. While the contract here makes reference to severance pay as wages, it is in no sense conclusive thereof. Claimants seeking priority under the Act must clearly establish their rights thereto. In re Marshall E. Smith & Bros., Inc., D.C., 35 F.Supp. 56, 57. To broaden the purview of the Act so as here to include severance pay as wages would be an extension thereof not warranted by the trend of the cases which has been to deny the benefit of the clause to those claimants who do not come specifically within its phraseology. In re Lawsam Electric Co., Inc., D.C., 300 F. 376; In re Estey, D.C., 6 F.Supp. 570; In re Pacific Oil & Meal Co., D.C., 24 F.Supp. 767; In re Lewis Company, D.C.R.I., 12 A.B.R. 279.

A thorough consideration of all the facts and circumstances convinces us (1) that the contract was never adopted by the Trustees and was not in effect after November 7, 1941, (2) that there was no "discharge" within the meaning intended in the severance pay clause, and (3) that even if the contract had been in effect between November 7, 1941, and January 5, 1942, and claimants had been "discharged" by reason of the cessation of business on January 5, 1942, the claims for severance pay would not be entitled to priority either as administration expenses or wage claims. Accordingly, the claim of the Newspaper Guild of Philadelphia and Camden for severance pay as well as the claim of the Philadelphia Typographical Union No. 2, I.T.U., for discharged pay is denied.

■ With respect to the claim for vacation pay raised by members of the Philadelphia Typographical Union No. 2 and the members of Philadelphia Mailers Union No. 14, it is apparent that the same disposition must be made of them. While the employees did work the entire year of 1941, the contract was not in effect the whole year as previously determined above, since it has been found that the contract was not in effect from November 7, 1941, to the end of the year as it had not been assumed by the Trustees.

A further difficulty arises in connection with the claimants' right to vacation pay since even if it were held that there was an assumption of the contract by the Trustees, under the authority of Section 64, sub. a(2), of the Bankruptcy Act, claimants would be entitled to priority for wages, not to exceed $600 to each claimant, which have been earned three months before the date of the commencement of the proceedings on November 7th. Since the contract provided that employees who held regular situations "during the entire previous calendar year" would be entitled to vacations with pay, the claimants could not have earned vacation pay until December 31, 1941, the end of the calendar year. On November 7, 1941, the date when the Union-Ledger contracts terminated by operation of law upon the appointment of Trustees, none of the claimants had earned vacation pay since the period of work required for the allowance of vacation pay under the terms of the contract had not been completed. Further, claimants did not become entitled to vacation pay on Decem-

ber 31, 1941, the end of the calendar year, because the contract was not in force and binding upon the Trustees at that time. There would therefore be no basis for earned vacation pay on November 7th because the work required for the allowance of such vacation pay had not been performed.

Claimants also press the contention that these claims for vacation pay have the status of costs of administration, if we assume that the Trustees adopted in their operation of the business the respective contracts herein involved. With this, we disagree. Section 64, sub. a(1), of the Bankruptcy Act limits priority to: "the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition." Since the petition was filed on November 7, 1941, the expenses of administration in conformity with the Act would be limited to those which arose between November 7, 1941, and January 5, 1942. As to giving priority to vacation pay as a cost of administration, it is pointed out that the right to vacation pay as hereinabove shown is dependent upon continuous employment for an entire calendar year and how one can work out a priority for vacation pay under this section as a cost of administration for which, at most, there would be only two months in which to earn it, is difficult to imagine. The term "cost of administration" has been strictly construed, and there is a noticeable tendency to enjoin any priority. In re Pacific Oil & Meal Co., supra.

Accordingly, the order of the Referee is sustained, and a decree may be presented in accordance with this opinion.

KALODNER, District Judge, took no part in the decision of this case.