Argued March 10, affirmed November 3, petition for rehearing
denied November 24, 1954

# THE UNITED STATES BANK OF PORTLAND *v.*
# SNODGRASS AND JOHNSON ET AL.

275 P2d 860

*Alton John Bassett,* of Portland, argued the cause and filed briefs for appellant.

*Robert L. Myers* and *Paul A. Sayre,* of Portland, argued the cause for defendants-respondents. On the

briefs were DePass & DePass, of Spartanburg, South Carolina, and Winfree, McCulloch, Shuler & Sayre, of Portland.

WARNER, J.

The United State National Bank of Portland (Oregon) in its capacity as trustee under the last will and testament of C. A. Rinehart, deceased, brings this suit against Merle Rinehart Snodgrass, the decedent's married daughter and sole heir, and 17 other defendants who are relatives and contingent beneficiaries of C. A. Rinehart. Plaintiff prays for a declaratory judgment establishing the validity and correct interpretation of the trusts set up by the testament and the rights, if any, of the defendants as beneficiaries thereunder.

On May 31, 1929, at a time when his daughter Merle was about 10 years old, Mr. Rinehart executed the instrument now before us for construction. Paragraph 7 of his will provides:

"I give and bequeath to the United States National Bank of Portland (Oregon), but in trust nevertheless, the sum of Fifteen Thousand ($15,-000.00) Dollars, or one-half (½) of residue if sum is more than Thirty-Thousand ($30,000.00) Dollars, to pay to my daughter Merle from the net income derived therefrom the sum of fifty ($50.00) Dollars each month beginning with the date of my death and until she attains the age of eighteen years, excluding, however, any period prior to the date of my death; Seventy-Five ($75.00) Dollars each month to her from the time of attaining the age of eighteen years and until she attains the age of twenty-five years; the whole of such net income to her from age twenty-five years and until she attains the age of thirty-two years. When my said daughter shall have attained the age of thirty-two years and

534

upon my death, that is to say, when these two events occur, my trustee is authorized and directed to transfer, assign and/or pay over to my said daughter Merle the whole of the trust fund of Fifteen Thousand ($15,000.00) Dollars, or the one-half (½) of the entire estate if sum is more than Thirty Thousand ($30,000.00) Dollars, provided she shall have proved conclusively to my trustee and to its entire satisfaction that she has not embraced, nor become a member of, the Catholic faith nor ever married. to a man of such faith. In the event my daughter predeceases me, or having survived me dies prior to attaining the age of thirty-two years or if living becomes ineligible to receive the trust fund then I direct the principal of such trust fund to be divided as follows:—In case either my wife or daughter forfeit their right to the trust fund, by death or otherwise, I want one or both of said funds divided between the following parties share and share alike. To my Mother Louise Rinehart, and my Sisters, Cordelia, Minnie and Mildred, and their children, and the children of my deceased brother Howard Rinehart, and my sister-in-law Bertie Rinehart, provided she shall not have married again—all of Spartanburg, South Carolina.''

The testator died in January 1942. It was stipulated that his daughter Merle became 32 years old on May 18, 1951; that sometime in 1944 she married a man who was a member of the Catholic faith; and that at the time she knew of the provisions of the foregoing paragraph 7 of her father's will.

The lower court concluded that the conditions of the bequest to the defendant Merle Rinehart Snodgrass, declaring a forfeiture of her rights in the corpus of the trust if she married a Catholic before her 32nd birthday, were valid and binding upon her and so decreed. The court then proceeded to declare and determine the respective interests of the various defendants who

were contingent beneficiaries, succeeding by reason of the forfeiture of Mrs. Snodgrass' gift in her father's estate. From this decree the defendant daughter alone appeals.

The appellant asserts that the court erred in holding as valid that provision of the will which disinherited her because of her marriage to a member of the Catholic faith before she was 32 years old. She leans heavily upon the proposition that such a provision violates public policy.

Mrs. Snodgrass did not join the Catholic church and therefore the clause restraining membership in that faith is not before us. Her loss, if any, accrues by reason of the restriction on her marriage to a Catholic within the time limitation. If the provision is valid, then the defendants-respondents take the entire corpus of the trust set up in the contested paragraph 7, and testator's daughter takes nothing.

The problem here is one of the validity of testamentary restraints upon marriage. While there is an abundance of law on the subject from other jurisdictions, the question and its solution are one of first impression in this court.

The briefs of both parties and some of their citations unavoidably employ various words and phrases which bring into focus the presence of religious prejudice which apparently dictated the contents of the paragraph occasioning this appeal. There we find, among other significant phrases, references to "religious tolerance", "religious freedom" and the "bigotry reflected by the will". No one will venture to gainsay that the father and his daughter in adulthood had entertained antipodal beliefs in the area of religious thought and faith. Indeed, it was the militant hostility of the father to the religion of Mrs. Snodgrass' husband

that kindled the flames of the controversy from which this appeal arises.

Litigation springing from religious differences, tincturing, as here, every part and parcel of this appeal, tenders to any court problems of an extremely delicate nature. This very delicacy, together with the novelty of the legal questions in this jurisdiction, warrants pausing before proceeding further and re-orienting our thinking in terms of the real legal problem which we must resolve. As a first step we rid ourselves of some erroneous definitions and the smug acceptance of conclusions arising from the too-frequent and inept employment of such terms as "religious freedom", "religious intolerance" and "religious bigotry". We also disassociate ourselves from the erstwhile disposition of many persons to treat any opposition to a religious faith as a prima facie manifestation of religious bigotry, requiring legal condemnation.

The testamentary pattern of Mr. Rinehart may offend the sense of fair play of some in what appears as an ungracious and determined effort to bend the will of another to an acceptance of the testator's concept of the superiority of his own viewpoint.

■ In terms of common parlance, "bigotry" and its concomitant "intolerance" are ordinarily odious and socially distasteful. They usually connote some intrusion upon or a variance with our traditional thoughts on religious liberty and religious tolerance; but we find nothing in the law declaring religious bigotry or intolerance to be mala in se. It is not until actions motivated by the intolerant extremes of bigotry contravene the positive law or invade the boundaries of established public policy that the law is quickened to repress such illegal excesses and in proper cases levy toll upon the offenders as reparation to those who

have been damaged thereby. It is the quality of the act or expression of the bigot—not one's bigotry—which determines the necessity, if any, for legal interposition.

The appellation "bigot" is therefore a word of social opprobrium, not one of legal condemnation. It can be, and often is, applied with equal force and propriety both to the proponents and opponents of a given thesis of public or religous interest, depending on the degree of their respective uncompromising and dogmatic assertions in the espousal of their several divergent views.

■ While one may personally and loudly condemn a species of "intolerance" as socially outrageous, a court on the other hand must guard against being judicially intolerant of such an "intolerance", unless the court can say the act of intolerance is in a form not sanctioned by the law. We are mindful that there are many places where a bigot may safely express himself and manifest his intolerance of the viewpoint of others without fear of legal restraint or punishment. With certain limitations, one of those areas with a wide latitude of sufferance is found in the construction of the pattern of one's last will and testament. It is a field wherein neither this court nor any other court will question the correctness of a testator's religious views or prejudices. *In re Lesser's Estate,* 287 NYS 209, 216, 158 Misc 895.

Our exalted religious freedom is buttressed by another freedom of coordinate importance. In condemning what may appear to one as words of offensive religious intolerance, we must not forget that the offending expression may enjoy the protection of another public policy—the freedom of speech.

■ The right to espouse any religious faith or any

political cause short of one dedicated to the overthrow of the government by force carries with it the cognate right to engage as its champion in the proselytization of followers or converts to the favored cause or faith. To that end its disciples are free to emphasize and teach what is believed by them to be its superior and self-evident truths and to point out and warn others against what its votaries deem to be the inferior, fallacious or dangerous philosophical content of opposing faiths or doctrines. No matter how specious, how intolerant, how narrow and no matter how prejudiced or how dogmatic the arguments of the devotees of one belief may appear to others of different persuasion, the right of either to so express himself is so emphatically a part and parcel of our public policy that it will be defended and protected by the courts of the land to the uttermost, unless it is found that the fanatical and unrestrained enthusiasm of its followers results in acts offensive to the positive law.

It is this unique right to freedom of expression, whether manifested in the political forum, the church chancel or other arenas of thought and action, that has not only contributed so much to the greatness of our country and has given it such a distinctive and distinguished place in the world family of nations but has given additional vitality and substance to our valued religious freedom.

If we will take heed of these things, we can better appreciate and more readily understand why the great majority of the courts have sustained rather than repudiated gifts limited by conditions such as Mr. Rinehart attached to his bequest to his daughter.

We therefore have no intention or disposition to disturb the provisions of Mr. Rinehart's will unless it can be demonstrated that they do violence to some legal

rule or precept. Two general and cardinal propositions
give direction and limitation to our consideration. One
is the traditionally great freedom that the law confers
on the individual with respect to the disposition of his
property, both before and after death. The other is
that greater freedom, the freedom of opinion and right
to expression in political and religious matters, to-
gether with the incidental and corollary right to imple-
ment the attainment of the ultimate and favored ob-
jectives of the religious teaching and social or political
philosophy to which an individual subscribes. We do
not intend to imply hereby that the right to devise or
bequeath property is in any way dependent upon or
related to the constitutional guarantees of freedom of
speech.

 We will first give attention to appellant's claim
that the provision for Mrs. Snodgrass is at odds with
the public policy of both the state and national govern-
ments. We preface this phase of our inquiry with the
following statement from 57 Am Jur 1017, Wills, § 1503,
approving it and adopting it as a guide in the evalua-
tion of the respective contentions of the parties to this
appeal:

"The right of a testator to attach to a gift in
his will any lawful terms he sees fit, no matter how
whimsical or capricious, is widely, if not universally,
recognized. Conditions which are regarded as con-
trary to law or public policy, which are impossible
of performance, or which are too vague and un-
certain in their phraseology to disclose the actual
intention of the testator, will not, however, be en-
forced, although it is established that in considering
any testamentary condition the court must indulge
a presumption in favor of its validity. When ques-
tions arise as to conditions or provisions being void
as being against the public good or against public
policy, great caution is necessary in considering

them; at different times very different views have been entertained as to what is injurious to the public.''

As we shall soon discover, there is nothing in our organic or statutory law or in prior decisions of this court which would strike down or limit a testamentary expression in the form that Mr. Rinehart elected to use in providing for his daughter.

■ Although the appellant rests her appeal primarily upon the premise that paragraph 7 of the will violates public policy, she brings to us no precise statute or judicial pronouncement in support of this contention; but before examining and demonstrating that the authorities cited by appellant are inapplicable, we think it is proper to observe here that it has long been a firmly-established policy in Oregon to give great latitude to a testator in the final disposition of his estate, notwithstanding that the right to make a testamentary disposition is not an inherent, natural or constitutional right but is purely a creation of statute and within legislative control. *Leet v. Barr et al.*, 104 Or 32, 39, 202 P 414, 206 P 548. This is supported by both statutory and judicial expression and points the way as an over-all direction to our own inquiry here.

As early as 1853 our legislature conferred upon every person of qualified age and sound mind the right to devise and bequeath all his estate, real and personal, saving such as is specially reserved by law to the decedent's spouse. ORS 114.020. This generous latitude in testamentary disposition conferred by statute is emphasized and expanded in the often-repeated statement of Mr. Justice WOLVERTON in *Holman's Will* (1902) 42 Or 345, 356, 70 P 908:

''The right of one's absolute domination over his property is sacred and inviolable, so that he may

do what he will with his own, if it is not to the injury of another. He may bestow it whithersoever he will and upon whomsoever he pleases, and this without regard to natural or legitimate claims upon his bounty; and if there exists no defect of donative capacity, whereby his individual will or judgment does not have intelligent and conscious play in the bestowal, or undue influence or fraud, whereby an unconscionable advantage may be taken of him through the wicked designs of another, the law will give effect to the disposition; and the right to dispose of one's property by will, and bestow it upon whomsoever he likes, is a most valuable incident to ownership, and does not depend upon its judicious use * * *. And this court has held, in effect, that 'while it seems harsh and cruel that a parent should disinherit one of his children and devise his property to others, or cut them all off and devise it to strangers, from some unworthy motive, *yet so long as that motive, whether from pride or aversion or spite or prejudice, is not resolvable into mental perversion, no court can interfere*' * * *.'' (Italics ours.)

Also see *In re Estate of Verd Hill*, 198 Or 307, 317, 256 P 735, and cases cited, where it is said that our previous holdings teach us that a ''testator is invested by law with substantially all the rights he enjoyed in life to make unfettered disposition of his property''.

No one has had the temerity to suggest that Mr. Rinehart in his lifetime could not have accomplished the equivalent of what he sought to accomplish by his will. It was within his power, with or without assigning any reason therefor, to have completely disinherited his daughter and left her in a state of impecunious circumstances. He could have gone even further and given all his fortune to some institution or persons with directions to propagandize his views adverse to

any certain religion or creed for which he harbored antipathies.

In *Magee v. O'Neill,* 19 SC 170, 45 Am Rep 765, the bequest was on the condition that the beneficiary granddaughter be educated in the Roman Catholic faith. There the court said (45 Am Rep 776):

> "The power of disposition is general. The power to give includes the right to withhold or to fix the terms of gift, no matter how whimsical or capricious they may be, only provided they do not in any way violate the law. Mr. Magee, in his life-time, could have given money to educate his granddaughter at a particular school, or he could have withheld it at his pleasure. Suppose he had entered into a covenant with Elizabeth or her mother, that if she was educated at a particular school named and under certain religious influences, he would, upon her attaining twenty-one years, pay to her five thousand dollars, we suppose that if she were not so educated, she could not go into the court and recover the money. Suppose, further, that before the time for payment arrived John Magee had died, would that strengthen her claim to recover the money against her [his] personal representatives? We are unable to see any material difference in regard to the necessity of complying with the terms imposed, between this supposed case and that of a voluntary gift by will."

While neither ORS 114.020 nor the Holman case affords a complete answer to the contentions of the plaintiff here, yet we submit that taken together they reveal a long-accepted pattern of public attitude and public policy in this state respecting an almost unrestricted right to dispose of one's property on death. In view of this liberality of testamentary power, we find no occasion to narrow the freedom of a testator's right to dispose of his accumulations unless we are

compelled to bend before some other public law or policy establishing limitations not presently apparent.

To sustain the contention that the contested provision of the will is against the public policy of the United States, appellant depends upon the First and Fourteenth Amendments to the United States Constitution; 42 USCA §§ 1981-1983, relating to civil rights (formerly, and as cited by appellant, 8 USCA, Ch 3, §§ 41-43); and *Shelley v. Kraemer,* 334 US 1, 92 L ed 1161, 68 S Ct 836, 3 ALR2d 441.

■■ The First Amendment prohibits Congress from making any law respecting the establishment of a religion. *Everson v. Board of Education,* 330 US 1, 15, 91 L ed 711, 67 S Ct 504, 168 ALR 1392. That amendment is a limitation upon the power of Congress. It has no effect upon the transactions of individual citizens and has been so interpreted. *McIntire v. Wm. Penn Broadcasting Co. of Philadelphia,* 151 F2d 597, 601, cert den 327 US 779, 90 L ed 1007, 66 S Ct 530; *In re Kempf's Will,* 297 NYS 307, 312, 252 App Div 28, aff 278 NY 613, 16 NE2d 123. Neither does the Fourteenth Amendment relate to individual conduct. The strictures there found circumscribe state action in the particulars mentioned and in no way bear on a transaction of the character now before us. Civil Rights Cases (1883) 109 US 3, 27 L ed 835, 3 S Ct 18.

Appellant presses upon our attention 42 USCA § 1983 as embodying a statement of federal public policy controlling here. It reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ The inapplicability of this argument is demonstrated by *Robeson v. Fanelli,* 94 F Supp 62. That litigation was a by-product of the so-called ''Peekskill riots'' of 1949 and brought under the provisions of § 1983 of Title 42, USCA, then § 43 of Title 8, USCA. The court in the Robeson case said, at page 66:

"In general, civil liberties are beyond the constitutional power of Congress to protect from encroachment by individuals unassociated with state action, inasmuch as the prohibitions of the Fourteenth Amendment with regard to due process, and equal protection are directed against the states exclusively. * * *''

*Shelley v. Kraemer,* supra, is authority only for the proposition that the enforcement by state courts of a covenant in a deed restricting the use and occupancy of real property to persons of the Caucasian race falls within the purview of the Fourteenth Amendment as a violation of the equal protection clause, but, said the court, ''That Amendment [Fourteenth] erects no shield against merely private conduct, however discriminatory or wrongful.'' (3 ALR2d 460)

Failing to find in appellant's citations any foundation for a federal public policy which will give her comfort or aid, we now turn to examine the authorities which she marshals in support of her claim of a public policy in Oregon which would compel us to strike the testamentary provision mandating a forfeiture of her share in the corpus of the trust created by her father. To this end she cites and relies upon Or Const, Art I, and Oregon Laws 1949, Ch 221.

Section 2 and 3 of Art I read:

"Section 2. * * * All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.—

"Section 3. * * * No law shall in any case whatever control the free exercise, and enjoyment of religeous (sic) opinions, or interfere with the rights of conscience.—"

█ The functions of these sections of Art I are akin to the objectives of the First Amendment, that is, positive bars to legislative action which might impair the full and free enjoyment of the religious liberties thus conferred; and, also like the First Amendment, they are retraints upon the government in dealing with its citizens and have no bearing on individual actions or transactions.

The appellant argues that the public policy of this state relative to matters of the kind now before us will also be found in Oregon Laws 1949, Ch 221 (now codified as ORS 659.020 to 659.140) and that law has the force and effect of invalidating restraints of the character imposed by paragraph 7 of the Rinehart will. Chapter 221 is entitled: "Relating to and providing for the elimination of *certain practices* of discrimination because of race, color, or religion or national origin". Section 1 declares the public policy of Oregon is "that practices of discrimination against any of its inhabitants because of race, religion, color or national origin are a matter of state concern * * *." Section 2 empowers the bureau of labor "to eliminate and prevent discrimination in employment because of race, religion, color or national origin". Section 3 provides: "The *opportunity to obtain employment* without discrimination because of race, religion, color or national origin hereby is recognized as and declared to be a

civil right." Section 4 defines "person", "employment agency", "labor organization", "unlawful employment practice", "employer", "employe", "bureau", "commissioner" and "national origin". Section 5 declares what shall be regarded as "an unlawful employment practice". Thereafter are five subdivisions addressed to a labor organization; an employer; employer or employment agency; employer, labor organization or employment agency; and any person whether employer or employe. Section 6 provides for complaints by one *claiming to be aggrieved by* "*an alleged unlawful employment practice*". The statute thereafter addresses itself to the hearing of such claims and is replete with indications that the relationship of employer and employe and practices of discrimination because of race, color, religion or national origin were intended to be regulated by the legislative assembly. (Italics ours.)

■ It is clear to us that the act when read in its entirety evidences a legislative purpose to prevent certain contractual discriminations in the areas of employment predicated upon prejudices and preferences arising out of race, religion, color or national origin. We are confident that the legislature by the act of 1949 did not entertain the slightest intention to establish a public policy as to relationships other than the status of employer and employe or make it applicable to testamentary dispositions.

■ It is not clear to us from appellant's argument whether she reads the offending provision of the will as an invasion of her constitutional right to religious freedom or views it as an unconstitutional act of discrimination; but whether one or the other, we are content that it does no violence to public policy arising from either category. If the contested portion is to

fall, it must be by force of some precept of public policy resting upon different grounds from those here urged by appellant.

We are not unmindful that even though no positive law can be found in Oregon limiting a testator as appellant would have us do here, we should, nevertheless, look into the decisions of the courts of other states to discover, if we can, the prevailing rule applied elsewhere when a testator attempts to limit or restrain the marriage of a beneficiary in the manner that the late C. A. Rinehart attempted to do.

■ The general rule seems to be well settled that conditions and limitations in partial restraint of marriage will be upheld if they do not unreasonably restrict the freedom of the beneficiary's choice. In 35 Am Jur 357-358, Marriage, § 256, we find:

"* * * where the restraint is not general, but is merely partial or temporary, or otherwise limited in effect, then the condition may or may not be void, according to whether it is considered reasonable or otherwise, and does not operate merely in terrorem. * * *

"* * * * * *

"Among the restrictions which have been held reasonable are: Conditions to marry or not to marry * * * a person of a particular * * * religion * * *."

Of the same tenor is 1 Restatement, Trusts, 194, § 62(g), reading, so far as pertinent:

"* * * such a provision is not invalid if it does not impose an undue restraint on marriage. Thus, a provision divesting the interest of the beneficiary if he or she should marry * * * a person of a particular religious faith or one of a different faith from that of the beneficiary, is not ordinarily invalid. * * *"

■ We turn to an examination of the controverted provision and note that the condition is not one of complete restraint, in which character it might well be abhorrent to the law. It is merely partial and temporary and, as we shall show later, is not in terrorem. Mr. Rinehart's daughter is not thereby restrained from ever marrying a Catholic. This inhibition as a condition to taking under the will at the age of 32 lasts only 11 years, that is, from the legal marriageable age without parental consent (in this state, 21 years). After the age of 32 she is free to marry a Catholic or become a Catholic if she so pleases and have her estate, too. Moreover, the condition imposed does not restrict the beneficiary from enjoying marital status either before or after attaining the age of 32. Here, unfortunately, appellant would eat her cake and have it, too.

■ In 25 ALR 1523 will be found an ably-edited annotation respecting wills with gifts conditioned that the beneficiary renounce, embrace or adhere to a specified religious faith. At page 1524 the editor makes this statement: ''The weight of authority, however, is to the effect that a testator has the right to make the enjoyment of his bounty dependent on the condition that the recipient renounce, embrace, or adhere to a particular religious faith.'' The following illustrative cases are cited: *Barnum v. Baltimore* (1884) 62 Md 275, 50 Am Rep 219; *Mitchell v. Mitchell* (1862) 18 Md 405; *Kenyon v. See* (1884) 94 NY 563, 29 Hun 212; *Magee v. O'Neill*, supra (1883) 19 SC 170, 45 Am Rep 765; *Re Paulson* (1906) 127 Wis 612, 107 NW 484, 5 LRA NS 804, 7 Ann Cas 652; *Renaud v. Lamothe* (1902) 22 Can L T Occ N 357, 32 Can SC 357; *Hodgson v. Halford* (1879) LR 11 Ch Div (Eng) 959, 40 LJ Ch NS 548, 27 Week Rep 545; *Clavering v. Ellison* (1859) 7 HL Cas 707, 11 Eng Reprint 282, 29 LJ Ch NS 761;

*Re Trust Funds* (1850) 1 Sim NS 37, 61 Eng Reprint 14, 20 LJ Ch NS 33, 15 Jur 282; *Re Knox* (1889) 23 LR Ir 542; *Maguire v. Boylan* (1871) Ir R 5 Eq 90; *Haughton v. Haughton* (1824) 1 Molloy (Ir) 611; *Laurence v. McQuarrie* (1894) 26 NS 164. To this list we add three more recent cases: *Delaware Trust Co. v. Fitzmaurice* (1943) Del, 31 A2d 383; *In re Kempf's Will,* supra (1937) 297 NYS 307; *In re Lesser's Estate,* supra (1936) 287 NYS 209. Only three cases to the contrary are found in the annotation and are the only ones employed by the appellant in support of a contrary rule.

Mrs. Snodgrass forthrightly concedes that the numerical weight of authority is against her position, and we add that our own examination of the several cases cited in 25 ALR and by us above give sound support and reason to the general rule therein stated and affirmed by 35 Am Jur 357, Marriage, § 256, and 1 Restatement, Trusts, 194, § 62(g). They are written with due respect to the same principles approving liberality in the making of testamentary disposition which underlie our more familiar ORS 114.020 and Mr. Justice Wolverton's opinion in *Holman's Will,* supra, 42 Or 345.

We shall not burden this opinion with an analysis of the cases cited in 25 ALR but because of their relative recency in the field of the law in which we are presently interested and because they give such complete answer to the arguments here advanced by appellant and others who strive for a departure from the general and prevailing rule as gleaned from the weight of authority, we attach much weight to *Delaware Trust Co. v. Fitzmaurice,* supra, and the two New York cases to which we now refer.

In the case of *In re Lesser's Estate,* supra, the pro-

vision of the will construed created a trust for the following purposes (287 NYS 211-212):

" 'To pay said sums to the children, that may survive me, of my son Max Lesser, on their respective twenty-first birthdays, provided these children are given a normal Jewish, liberal education including an ability to read Hebrew, up to and including at least their fourteenth year: and, further, provided that the Jewish dietary laws are observed by their parents up to and including the confirmation of these my present grandchildren * * *. If these conditions are not complied with to the complete satisfaction of my executor or his successor or successors, then the funds herein bequeathed are to go to the "Federation for the Support of Jewish Philanthropic Societies of New York City" * * *.' "

The objections there raised were disposed of by the court in these words (287 NYS 216):

"Conditions involving the personal habits and traits of character of a potential recipient of a testator's bounty have frequently been sustained. * * * [Citing cases] The conditions here postulated respecting maintenance of the Jewish faith are analogous. The testator has in effect stipulated that to participate in his bounty, his grandchildren must live in the Orthodox Jewish manner which he may have deemed essential for their eternal salvation. It is not for this or any other court or person to question the correctness of his views or prejudices. His evident object was to see to it that the recipients of his bounty adhered at least to the outward manifestations of the religious faith in which he believed. Since they are all infants of tender years, it was obvious that the only method by which their desired faith could be assuerd would be through the co-operation of their parents. All of the conditions in this regard were conducive to this end and were, indeed, the only conceivable means of attaining it. There is nothing any more contrary to our policy in the requirement of a testa-

tor that his beneficiary should espouse and be trained in a certain religious faith, than in a stipulation that he shall marry one of a certain belief, which has been sustained. Matter of Seaman's Will, 218 N.Y. 77, 81, 112 N.E. 576, L.R.A. 1917A, 40, Ann. Cas. 1918B, 1138.''

In *In re Kempf's Will,* supra, 297 NYS 307, the testator made substantial gifts to his grandchildren payable when they became 21 years of age but made upon the condition that said children " 'shall be brought up and educated in the faith of and according to the Roman Catholic Religion' '', otherwise the provision to be void. In respose to the argument seeking to invalidate the condition, the court says, at page 312:

"It is said that the condition violates the provisions of the Federal Constitution (First Amendment) and the State Constitution (article 1, § 3) which guarantee religious freedom. With this argument we do not agree. The purpose of the constitutional provisions which petitioner invokes was to protect all denominations by prohibiting the establishment under state sanction of any single form of religion which would deprive nonadherents to a church thus established of the right to worship according to the dictates of their own conscience. These constitutional guarantees of religious freedom are limitations upon the power of government, not upon the right of an individual to make such testamentary disposition of his property as he may desire provided always that positive law or public policy is not contravened. We find nothing in the condition here in question which deprives the petitioner of freedom of conscience as to his religion; nor is it against public policy. Such an inducement by the testator, if it be so considered, to further the interests of his chosen religion and to perpetuate it within the circle of his family, can hardly be said to be a denial of religious freedom to those affected thereby. True it is that terms were annexed to the

bequest which some might have found onerous, but they could have been declined from motives of conscience or for any other reason. If the petitioner could not in conscience accept the faith of his grandfather, knowing its demands, he could have renounced the legacy thus conditioned. Having chosen to make the petitioner an object of his bounty, the testator had the right to burden his gift with conditions. If those conditions are legal the petitioner cannot disregard the burden and successfully demand the bounty.''

In *Delaware Trust Co. v. Fitzmaurice,* supra, we find a will wherein the receipt of income from a testamentary trust created by decedent was made payable to Ruth M. Ogle '' ' so long as she lives up to and observes and follows the teachings and faith of the Roman Catholic Church, and no longer' ''. Here the court in upholding the provision follows and cites all the cases relied upon in the annotation above referred to from 25 ALR 1524, and meets the contention of the beneficiary Ogle as follows (31 A2d 389):

"Ruth M. Ogle contends that such a condition, attached to a material gift, tends to induce fraud and hypocrisy, and tends to replace the real religious beliefs of a legatee by a mere pretended belief in other doctrines, with which she may have no real sympathy, and is, therefore, contrary to the moral wellbeing of the State, and an invalid restriction on her rights. Maddox v. Maddox's Adm'r, 11 Grat., Va., 804; 2 Page on Wills, 2nd Ed., 1920. Few courts have adopted that broad contention; Drace v. Klinedinst, 275 Pa. 266, 118 A 907, 25 A.L.R. 1520, involved different principles. The law, relating to conditions in absolute restraint of marriage, is not applicable. In re Trust Funds, supra. Moreover, neither Section 1 of Article 1 of the State Constitution, nor any provision of the Federal Constitution affects this conclusion. Religious freedom is guaranteed to all citizens, and any legislation affecting that

right is prohibited; but the mere inducement to adopt or to adhere to a particular religious belief is not a denial of religious freedom. Magee v. O'Neill, In re Kempf's Will, In re Paulson's Will, supra; 12 C.J. 945; 16 C.J.S., Constitutional Law, § 206. The constitutional guarantees are limitations on the powers of the government, not on the rights of the governed.''

The court held that Ruth M. Ogle was not entitled to the gift in question.

It will be observed that the condition of restraint imposed by the will construed in *Delaware Trust Co. v. Fitzmaurice*, supra, above quoted and in that case declared valid, is far more inclusive than the one in the will now before us in that the condition was operative during the entire life of the donee. In the instant matter, the restraint on free choice of religion became inoperative after the legatee became 32 years old.

So far as we are able to ascertain, only two states— Pennsylvania and Virginia—have invalidated testamentary provisions committing the beneficiary to adhere to the doctrines of a particular religion. This departure from the majority rule is reflected by *Drace et al. v. Klinedinst* (1922) 275 Pa 266, 118 A 907, 25 ALR 1520; and *Maddox v. Maddox* (1854) Va, 11 Grat 804.

The appellant can garner no comfort from the Pennsylvania case wherein the testamentary provision is declared invalid on the basis of an entirely different theory from the one here present. It rests upon a state of facts wholly unlike those apparent in the instant matter. In the Maddox case the condition was that the testator's daughter should marry a member of the Society of Friends. There were only five or six marriageable males of that faith within the circle of her ac-

quaintances, and under the circumstances peculiar to that case the court held that the condition was an unreasonable restraint on marriage.

The last contention of Mrs. Snodgrass requiring consideration is that the offending provision is in terrorem and therefore invalid.

The phrase "in terrorem" is not new to the law of wills, although infrequently applied. It has been defined as "In terror, or warning; by way of threat. The term is applied to gifts or legacies given on conditions subsequent, because it is said that the possibility of losing the gift tends to inspire fear or dread." 42 CJS 491. It is a rule designed to test the validity of gifts with certain conditions subsequent.

■ Generally, conditions in restraint of marriage are said to be in terrorem and therefore invalid when the subject of the gift is personal property and *there is no gift over*; but such a condition is not void as being in terrorem when there is a gift over. It is the absence of a gift over which supplies the quality of a coercive threat necessary to bring the condition under the in terrorem rule. 35 Am Jur 367, Marriage, § 266. It is also said in 35 Am Jur, supra, 369, § 267:

> "It is a general rule that in order to take a condition out of the category of conditions in terrorem, the gift over must be both express and immediate, to take effect at the time of the marriage. It must be to a definite person—a gift over to the 'legal heirs' of the first taker is insufficient. * * *"

"The condition where there is no devise over, is said to be *in terrorem* merely, a convenient phrase adopted by judges to stand in place of a reason for refusing to give effect to a valid condition." *Hogan v. Curtin,* 88 NY 162, 171, 42 Am Rep 244. We are impressed with the truth of that sapient observation, revealing as it

does the tenuous foundation for this seldom-used rule of construction. We also find it an affront to intelligence and a strain upon imagination to be asked to assume that if there is no gift over, then it is a matter of natural expectation that a named beneficiary will be terrified into an acceptance of the conditions attached to the gift, knowing that if he does not, the testator's gift may go to parties unknown.

Because of its irrational quality and its indefensible character as a "convenient phrase * * * to stand in place of a reason", we cannot recognize it as having any proper place in our jurisprudence and therefore decline to apply it as a medium for testing the validity of the seventh paragraph of Mr. Rinehart's will.

Before coming to the foregoing conclusion, we made inquiry to discover to what extent, if any, this court had employed the term as a test of validity to a condition in restraint. Our research produced but one instance, *Wadsworth v. Brigham et al.* (1928) 125 Or 428, 259 P 299, 266 P 875. In that case the court struck down a provision in a will which cast upon one claiming to be a legal heir of the testator the duty to legally establish such claim and thereafter be limited to a gift of $5. The operation of this provision as worded put upon plaintiff who claimed to be the daughter and sole heir of the testator the heavy duty of proving her legitimacy. The provision was held to be invalid as to the plaintiff appellant for the reason that she as a child of the testator had not been named or provided for as required by ORS 114.250 (then OL § 10101). After so holding the court concluded with this dictum (125 Or 455): "Furthermore, this provision being *in terrorem*, it is void." With this state of the record it is difficult to conclude that we are departing from an

established rule of this court when we express our disinclination to apply it here or in the future.

The appellant here is in a rather anomalous position when she attempts to invoke the rule of "terror", for her very act in marrying a Catholic before becoming 32 attests its innocuous effect as an inspiration to fear so far as the full exercise of her own judgment was concerned.

We conclude with a statement from *Magee v. O'Neill,* supra, 19 SC 170, 45 Am Rep 765, 776-777, substituting the name of the beneficiary here for the one named in the Magee will:

> "We cannot say that the terms of this will so far exceed the license which is allowed the citizen in the disposition of his own property, as to render it void as against public policy. We do not understand that there was anything in this bequest which can be properly called coercion, or that [Merle Rinehart Snodgrass] was 'deprived' of the liberty of conscience. Terms were attached to the bequest which may seem to us exacting, unkind and unnecessary, but we cannot say they were unlawful or that they were complied with. If they were declined from conscientious motives, far be it from us to say that such conduct was wrong; but from our view of the law, we are constrained to hold that the legacy * * * must go to those to whom, in the event which has happened, it was given by the will."

Affirmed. Neither party will recover costs.

Brand, J., dissents.