**City of Chicago, Appellee, v. John Corney, Jr. et al., Appellants.**

**Gen. No. 47,055.**

First District, First Division.

April 29, 1957.

Released for publication May 21, 1957.

Howard T. Savage, of Chicago, for appellants.

John C. Melaniphy, Corporation Counsel of the City of Chicago, of Chicago (Sydney R. Drebin and Harry H. Pollack, Assistant Corporation Counsel, both of Chicago, of counsel) for plaintiff-appellee.

PRESIDING JUSTICE NIEMEYER delivered the opinion of the court.

Defendants appeal from separate judgments for $100 and costs entered against each of them on a finding of guilty of disorderly conduct, in violation of Chapter 193, Section 1, sub-section 1 of the Municipal Code of Chicago.

Defendants are a mixed racial group—four Caucasians and two Negroes. All of the defendants except Jeanne Wesson were members of the Chicago Committee of Racial Equality, commonly referred to as CORE, an organization dedicated to the principle of achieving racial justice through the use of nonviolent methods. On May 11, 1956, about 10:30 p. m., defendants and four other persons went to Jennie's Restaurant at 658 East 79th Street, Chicago, a licensed public tavern and restaurant, for supper; they were refused

service; they remained on the premises and stated their intention to stay until they were served or the place was closed; the police were called by the manager and defendants were arrested; they were tried on a complaint sworn to by Michael Berg, a customer at the bar, charging the making or aiding in making an improper noise, riot, disturbance, breach of peace, or diversion tending to a breach of the peace.

Two Negro members of the group—one a defendant —had previously been denied service in the restaurant. Jeanne Wesson had previously visited the premises with persons other than the defendants and talked with the bartender, who was also the manager, about service to people without reference to race or color. They were unable to see Jennie. The bartender testified that he had said he would not serve Negroes in the tavern. At a meeting of the group in the home of one of its members on May 11th they decided to go to the restaurant for food. Each defendant testified as to what was to be done to procure service. Defendant Wesson, married and the mother of two children, said that their purpose, if not served, was to sit there and wait until somebody came to talk to them, and maybe they could persuade the management by words and nonviolent action to serve the members of the group. She defined nonviolent action as "action taken to achieve a change with love, without rancor, without violence of any kind, physical or any other type of violence, words, mental, emotional, and so on." Defendant Fields, a shipping clerk and husband of defendant Katherine Fields, testified that they did not intend to use any violent means or any loud or abusive language in order to be served. Defendant Corney, an artist, said that they intended to get service by sitting down and waiting until served; they had no intention to use any violent methods to force people to serve them. Defendant Forbes, a medical technician, testi-

398

fied it was "not our intention to obtain service regardless of the means"; their intention "was to remain seated until such time as we would be served or the place would close," and "it was clearly understood that this was the method to be used." Defendant Katherine Fields said they went to the tavern to be served and to wait to be served because Jennie's had a public license. Defendant Drews, a 20-year-old student and employee of a university, said that the sole purpose of going to Jennie's was a "desire to be served regardless of the racial composition of the group." There is no other evidence as to the intent or plan of the defendants, and the court correctly found that defendants "definitely planned to enter Jennie's place and insist in a non-violent manner to obtain service of food."

There is a direct conflict in the evidence as to the means and manner of the entry of the group into the restaurant and of the conduct of the respective defendants after entry, particularly with reference to defendants Katherine Fields and Drews. Plaintiff's evidence is to the effect that ingress to and egress from the premises at the main entrance was controlled by a buzzer operated by the bartender, who could see persons, wishing to enter, through the glass of the inner door of the vestibule; that the group, including defendants, entered when he pressed the buzzer to permit the exit of customers; that they were noisy, grabbed seats at tables marked reserved, threw themselves on the floor and boisterously demanded service and refused to leave after being told that the kitchen, or the place, was being closed and they would not be served. When required to detail the actions of each defendant, the witnesses for plaintiff, except Berg, limited their testimony to the conduct of Katherine Fields and Drews. They testified that Katherine Fields was loud and boisterous from her entry to the premises until placed under arrest, shouting her demand for service and

creating a disturbance; that Drews laid on the floor several times, obstructing the aisles and interfering with the orderly passage of patrons and employees in the premises. Berg testified that Fred Fields and Corney started hollering "We want service." Testimony on behalf of defendants is to the effect that the entry into the premises was peaceful and quiet, through an unlocked door; that they sat at tables not marked reserved and asked to be served with food, without noise or disturbance; that the tables at which they were sitting were forcibly removed and they were told they would not be served, and an effort was made to remove them from the premises.

In finding defendants guilty the court said:

". . . evidently they (defendants) had some skepticism in their minds about being served here; nevertheless, they did go to Jennie's place and whether or not the tables were marked reserved and whether or not they were told the kitchen was closed or whether or not they were refused service in an outright manner without any other statement being made, is immaterial in this case. *The important thing as I see it,* . . . they were definitely told either that the kitchen was closed or that they would not be served, or that the tables were reserved, and *they knew shortly after they entered that under no circumstances would they receive any food on that particular evening. Yet, notwithstanding that fact* . . . *they continued to remain there, all times knowing full well that they would not be served at that particular time. Their action in so doing, together with the testimony as brought out by the City's witnesses that there was a lot of noise, that they were tumultuous,* and that Joffree Stewart (not a defendant here) hit the floor as soon as he got in this restaurant; that he was joined there shortly by one of the other defendants; that one of the defendants in

400

particular continued shouting for the entire time she was there, *and that this was a concerted plan of action of all the defendants that remained there,* and their action was such that might very well have caused other individuals in the place to become violent against these particular individuals who are now on trial. Their action was not such that one would say that they were in the peace of the people." (Emphasis added.)

According to this statement the judgment was based on a finding that defendants remained in the restaurant, "knowing full well that they would not be served," coupled with noise and tumultuous conduct—the concerted plan of all defendants. The principal question is the right, if any, of persons conducting themselves in a peaceful and orderly manner, to remain in the tavern and restaurant after service has been denied them on account of race or color, or because members of the group are Negroes. The statute of the state, generally referred to as Civil Rights statute, in so far as it is pertinent here (Ill. Rev. Stats. 1955, chap. 38, par. 125), provides in section 1 that

"All persons within the jurisdiction of said State of Illinois shall be entitled to the full and equal enjoyment of the accommodation, advantages, facilities and privileges of inns, restaurants, eating houses, hotels, . . . taverns, . . . cafes, . . . and all other places of public accommodations and amusement, subject only to the conditions and limitations established by laws and applicable alike to all citizens; . . . ."

Section 2 provides that any person who shall violate the provisions of section 1

"by denying to any citizen, except for reasons applicable alike to all citizens of every race and color, and regardless of color or race, the full enjoyment of any of the accommodations, advantages, facilities or privi-

401

leges in said section enumerated, or by aiding or inciting such denial, shall for every such offense, forfeit and pay a sum not less than $25 nor more than $500 to the person aggrieved thereby, . . . and shall also, for every such offense be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined not to exceed $500, or shall be imprisoned not more than one year, or both."

■ ■ The purpose of the statute, as stated in Pickett v. Kuchan, 323 Ill. 138, "is to regulate, for the promotion of the public good, certain businesses in which the public have an interest, and it is therefore remedial." As applied to taverns and restaurants, such as Jennie's, the statute imposes obligations and duties and gives to persons wishing to patronize such places rights unknown to the common law. Horn v. Illinois Cent. R. Co., 327 Ill. App. 498. Under the statute, the accommodations, advantages, facilities and privileges of taverns and restaurants, like those of inns and common carriers of passengers or freight under the common law, must be made available on equal terms and conditions to all persons without distinction as to race or color. Persons seeking such accommodations, etc., cannot be excluded from the premises so long as they conduct themselves in a peaceable and orderly manner. The rule governing common carriers is stated in Old Colony Railroad Co. v. Tripp, 147 Mass. 35 (1887). In that case the railroad company brought a tort action against defendant for obstructing the station grounds of plaintiff at Brockton; defendant, the owner of a job wagon engaged in carrying baggage and merchandise, had been going to plaintiff's station to wait for trains and solicit business from passengers on plaintiff's trains. The railroad entered into a contract with Porter and Sons to handle that business, and posted a notice in the station excluding other job wagon owners from entering the station to solicit business. The trial

court directed a verdict for plaintiff. On appeal the judgment was affirmed, and the court, in defining the rights of plaintiff in its station, held that passengers taking and leaving the trains at the station had a right to access and use of the station buildings and grounds superior to the rights of the plaintiff to exclusive occupancy. It said (pages 36–37):

"The plaintiff has all the rights of an owner in possession, except such as are inconsistent with the public use for which it holds its franchise; that is, with its duties as a common carrier of persons and merchandise. . . . It provided its depot for the use of persons who were transported on its cars to or from the station, and holds it for that use, and it has no right to exclude from it persons seeking access to it for the use for which it was intended and is maintained. . . . The station was a passenger station. Passengers taking and leaving the cars at the station, and persons setting down passengers or delivering merchandise or baggage for transportation from the station, or taking up passengers or receiving merchandise that had been transported to the station, *had a right to use the station buildings and grounds, superior to the right of the plaintiff to exclusive occupancy.* All such persons had business with the plaintiff, which it was bound to attend to in the place and manner which it had provided for all who had like business with it." (Emphasis added.)

■ ■ The defendants here, so long as they conducted themselves in an orderly manner, had a right superior to the rights of the owners and employees of the tavern and restaurant business, to enter the premises and wait for service, so long as the place was open and occupied by others enjoying the accommodations of the business being conducted there. The owners and employees could not, by violating the law and refusing

403

service on account of the race or color of some members of the group, deprive them of the right. Excepting the defendants Katherine Fields and Drews, the record does not support the finding of noisy or tumultuous conduct. No witness for plaintiff mentions the defendant Forbes. He was merely present. Defendant Wesson passed out three or four pamphlets published by CORE to patrons at the bar, and conversed with several of them—so far as the record shows, in conversational tone and without objection from the patrons. Although Berg testified that Fred Fields and Corney shouted "We want service," the bartender merely says that Fields was standing and Corney was sitting during the occurrence. Fields and Corney deny any disorderly or boisterous conduct. The statement of the court that the action of Drew in lying on the floor, and of Katherine Fields in shouting continuously during the time she was in the restaurant, was "a concerted plan of action of all the defendants," is in direct conflict with the finding, heretofore stated, that the defendants "definitely planned to enter Jennie's place and insist in a nonviolent manner to obtain service of food." It is also contrary to the undisputed testimony of the defendants, hereinabove stated.

The finding of the court as to defendants Katherine Fields and Drews is not against the manifest weight of the evidence. Their conduct cannot be justified by any right to service in the restaurant, or excused by disregard of that right by the manager. The judgment as to these defendants is affirmed. The judgment against the remaining defendants is reversed.

Affirmed in part, reversed in part.

BURKE and FRIEND, JJ., concur.