## No. 19,771.

THE COLORADO ANTI-DISCRIMINATION COMMISSION, ET AL.
*v.* CONTINENTAL AIR LINES, INC.
(368 P. [2d] 970)

Decided February 13, 1962.   Rehearing denied March 5, 1962.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. CHARLES S. THOMAS, Assistant, for plaintiff in error Anti-Discrimination Commission.

Mr. T. RABER TAYLOR, for plaintiff in error Marlon D. Green.

Messrs. HOLLAND & HART, Mr. PATRICK M. WESTFELDT, Mr. WILLIAM C. MCCLEARN, Mr. WARREN L. TOMLINSON, for defendant in error.

*The following counsel were permitted to appear and file briefs as Amici Curiae:*

Mr. BURKE MARSHALL, Assistant Attorney General of the United States, Mr. HAROLD H. GREENE, Mr. DAVID RUBIN, Assistants,

Mr. ARNOLD FORSTER of the the New York Bar, General Counsel, Mr. PAUL HARTMAN, of the New York Bar, Mr. SOL RABKIN, of the New York Bar, Associate Counsel, Messrs. DONALDSON, HOFFMAN & GOLDSTEIN, of the Colorado Bar, Counsel, Anti-Defamation League of B'nai B'rith,

Mr. EDWIN J. LUKAS, of the New York Bar, General Counsel, Mr. THEODORE LESKES, of the New York Bar, Associate Counsel, Mr. CHARLES ROSENBAUM, of the Colorado Bar, Counsel, American Jewish Committee.

Mr. MANDEL BERENBAUM, Mr. LOUIS G. ISAACSON, Mr. JOSEPH MOSKO, Mr. JAMES TADETSKY, Mr. STANTON ROSENBAUM, Mr. WALTER M. SIMON, Mr. ANTHONY F. ZARLENGO, Mr. WILLIAM S. POWERS.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

MARLON D. GREEN filed a complaint before the Colorado Anti-Discrimination Commission in which he alleged that the Continental Airlines violated the Colorado Anti-Discrimination Act of 1957 by refusing to employ him as an airline pilot on or about July 8, 1957, because he is a Negro. It was further alleged that Continental Airlines violated the said act in that its forms of application for employment as a pilot contain at least two specifications prohibited by the act, namely, attachment of a photograph and requiring the applicant to state his race.

After a hearing before the Commission it ordered that:

"The Respondent (Continental) shall give to the Complainant (Green) the first opportunity to enroll in its training school in its next course, and the priority status of the Complainant shall be fixed as of June 24, 1957."

On review of the commission's order the district court held that the Colorado Anti-Discrimination Act, in so far as it purported to regulate the employment of flight crew personnel of an interstate air carrier, was invalid as creating a burden upon interstate commerce. The trial court entered a judgment ordering the dismissal of Green's complaint before the commission. Green and

the commission are here by writ of error seeking reversal of the judgment.

In 1937 the General Assembly enacted the following statutes — (now C.R.S. '53, 5-1-2, 5-1-3 and 5-1-8):

"5-1-2: NAVIGATION OF AIRCRAFT: The public safety requiring and the advantages of uniform regulation making it desirable in the interest of aeronautical progress that aircraft operating within this state should conform with respect to design, construction and airworthiness to the standards now, or hereafter to be prescribed by the United States government with respect to navigation of aircraft subject to its jurisdiction, it shall be unlawful for any person to navigate an aircraft within the state unless it is licensed and registered by the department of commerce of the United States in the manner prescribed by the lawful rules and regulations of the United States government then in force.

"5-1-3: LICENSE FOR NAVIGATION: The public safety requiring and the advantages of uniform regulations making it desirable in the interest of aeronautical progress that a person engaging within this state in navigating aircraft designated in section 5-1-2 in any form of navigation for which license to operate such aircraft would be required by the United States government shall have the qualifications necessary for obtaining and holding the class of license required by the United States government. It shall be unlawful for any person to engage in operating such aircraft within this state in any form of navigation unless he have such a license.

"5-1-8: INTERPRETATION: This article shall be so interpreted and construed as to effect its general purpose and to make uniform the law of those states which enact it and to harmonize as far as possible, with federal laws and regulations on the subject of aeronautics."

Thus in 1937 the legislature gave recognition to federal laws and regulations in the realm of aeronautics.

■ The Colorado Anti-Discrimination Act of 1957 provides in C.R.S. '53, 80-24-2 (5):

" 'Employer' shall mean the state of Colorado or any political subdivision or board, commission, department, institution or school district thereof, and every other person employing six or more employees within the state; * * * "

80-24-6 (2) provides that it shall be an unfair employment practice, "For an employer to refuse to hire, to discharge, to promote or demote, or to discriminate in matters of compensation against, any person otherwise qualified, because of race, creed, color, national origin or ancestry."

Continental Airlines, among other defenses not necessary to consider, raises the question of whether the Anti-Discrimination Commission has any jurisdiction over the subject matter of the action.

It is admitted that Continental is a commercial carrier by air; that it operates pursuant to a certificate of public convenience and necessity issued by the Civil Aeronautics Board. The company provides air transportation for passengers, freight, and United States mail between the states of Colorado, Texas, Oklahoma, New Mexico, Kansas, Missouri, Illinois and California. Continental was admittedly engaged in interstate commerce, and it was further agreed that the particular employment sought by Green involved interstate operations.

Continental contends that the Colorado statute under which these proceedings were instituted, as applied to the facts of this case, is unconstitutional and void under Article I, Sec. 8, clause 3 of the Constitution of the United States which provides: "The Congress shall have power * * * To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Congress has pre-empted the field of law concerning racial discrimination in the interstate operations of carriers (generally and specifically with relation to employment of interstate operating personnel) and has

thereby precluded exercise of authority by the several states in this field.

The trial court adjudged in effect that the Colorado Anti-Discrimination Act cannot constitutionally be extended to cover the hiring of flight crew personnel of an interstate air carrier; that if said Act be applied to the hiring contracts of interstate air carriers it would unconstitutionally burden interstate commerce and would amount to an invasion of a field pre-empted by the United States under (a) The Railroad Labor Act; (b) the Civil Aeronautics Act; and (c) Federal executive orders dealing with discrimination by employers contracting with the federal government. The trial court entered judgment setting aside the findings of the commission and dismissing Green's complaint.

The United States and certain other groups interested in the subject matter of the controversy were granted leave to file briefs as amici curiae. In the brief filed by the Assistant Attorney General of the United States, argument is advanced under separate captions as follows:

"I. The Commission's assertion of jurisdiction herein does not unconstitutionally burden commerce.

"II. Colorado is not precluded by federal legislative or executive action from applying its anti-discrimination policy to the hiring practices of interstate air carriers."

Counsel for Green, in substance, make the same argument on the question of whether the State of Colorado has jurisdiction to regulate the hiring practices of those engaged in interstate air transportation.

With reference to the above stated propositions Continental presents lengthy argument under the following captions:

"1. The Colorado Anti-Discrimination Act May Not Constitutionally be Applied to Flight Crew Personnel of an Interstate Air Carrier.

"A. Application of the Colorado Anti-Discrimination Act to the Facts of This Case is Unconstitutional as a Burden on Commerce.

"B. Acts of Congress have Pre-empted the Subject Matter of this Litigation, Thereby Precluding Action by the States."

Although additional arguments on other matters are contained in the briefs, they were not determined in the trial court. The only question resolved was that of jurisdiction. The trial court determined that the act was inapplicable to employees of those engaged in interstate commerce, and the judgment was based exclusively on that ground.

The first question to be resolved on this writ of error is whether the Colorado Anti-Discrimination Act may be applied to flight crew personnel of an interstate air carrier. If the question is answered in the negative other arguments directed to the merits of the action, and questions relating to the validity of the act when tested by provisions of the Colorado Constitution, are academic and of no materiality to the issue to be determined.

The trial court entered extensive Findings of Fact, Conclusions of Law and Judgment. As set forth in the appendix to the brief of Continental, this document consists of thirty-eight printed pages. It is very apparent that the learned trial judge gave careful consideration to the numerous decisions of the Supreme Court of the United States which bear upon the issue. Many of them are analysed in the judgment entered by the court. The findings, conclusions and judgment of the trial court might well be adopted in toto as the opinion of this court. However in the interest of brevity we will do no more than mention a few decisions which we think control the result.

From the numerous opinions written by the United States Supreme Court dealing with the legality of state regulation of those engaged in interstate commerce, two basic propositions have been firmly established, to wit:

(1) In those areas of interstate commerce which by their nature require uniformity of regulation by a

single authority, the states are without power to act even though Congress has not legislated on the subject; and

■ (2) In areas of interstate commerce which do not require such uniformity of regulation and in which the states may act because the matters are in some substantial degree of local concern; once the Congress does legislate upon the subject, it pre-empts the field and the states are thereafter without power to act.

■ An attempt by the state to apply a statute imposing burdens or restrictions upon persons engaged in either of the foregoing areas of interstate commerce will be set aside and held for naught as contravening the plenary power of the Congress to regulate interstate commerce. *Cooley v. Port Wardens of Philadelphia,* 12 How. 299, 13 L. Ed. 996; *Southern Pacific Co. v. Arizona,* 325 U. S. 761, 65 S. Ct. 1515; *Minnesota Rate Cases,* 230 U. S. 352, 33 S. Ct. 729. This power in Congress is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than as are prescribed in the Constitution." *Gibbons v. Ogden,* 9 Wheat 1, 6 L. Ed. 23.

■ Racial discrimination by an interstate carrier is a subject which must be free from diverse regulation by the several states and governed uniformly, if at all, by the Congress of the United States. Whatever our private notions may be on the subject, the opinions of the U.S. Supreme Court have established the rule.

In *Hall v. DeCuir,* 95 U.S. 485, 24 L. Ed. 547, (1877), the court had before it a Louisiana statute which prohibited discrimination in passenger accommodations within the state. The defendant, owner of a passenger steamship which traveled the Mississippi River between Louisiana and Mississippi, had refused certain accommodations to a Negro and was sued by her. The court concluded that the statute as applied to those engaged in the transportation of passengers among the states was unconstitutional. The court said, inter alia:

"But we think it may safely be said that state legislation which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position."

In *Morgan v. Virginia,* 328 U.S. 373, 66 S. Ct. 1050, a statute of the State of Virginia required segregation of white and colored passengers for both intrastate and interstate motor vehicle carriers. An interstate passenger who was a Negro challenged the validity of the statute as placing a burden on interstate commerce. The court held that the statute as applied to interstate carriers was unconstitutional. *Hall v. DeCuir,* supra, was approved in the following language: "The factual situation set out in preceding paragraphs emphasizes the soundness of this court's early conclusion in Hall v. DeCuir."

█ Counsel seeking reversal of the judgment of the trial court attempt in various ways to discredit the opinion of *Hall v. DeCuir.* It is asserted in the brief filed by the United States as amicus curiae that *Hall v. DeCuir* was "handed down seventy-six years prior to *Brown v. Board of Education,* 247 U.S. 483"; that the case has "long been eroded and devitalized" and that it "has no vitality today." The Supreme Court of the United States has not so indicated. *Brown v. Board of Education,* supra, did not involve interstate commerce. As recently as 1960 *Hall v. DeCuir* was cited with approval in *Huron Portland Cement Company v. City of Detroit,* 362 U.S. 440, in which the United States Supreme Court said: "But a state may not impose a burden which materially affects interstate commerce in an area where uniformity of regulation is necessary. *Hall v. DeCuir,* 95 U.S. 485."

Our attention is invited to the fact that the United States does not consider *Hall v. DeCuir,* to be "devitalized" in those matters in which application of the doctrine for which it is authority will promote a result

sought by the government. On September 2, 1960, the United States appearing by counsel, who are on the brief in the instant case, filed a brief as amici curiae with the Supreme Court of the United States in *Boynton v. Virginia*, 364 U.S. 454, in which we find the following: "Thus, even in the absence of congressional action, the Commerce Clause, of its own force, requires invalidation of unreasonable state-imposed burdens on interstate commerce. See *Morgan v. Virginia*, 328, 373; *Hall v. DeCuir*, 95 U.S. 485. * * *"

Thus it will be seen that counsel for the United States, appearing here as amicus curiae, attempts like the Roman god Janus to face both ways.

The State of Colorado either does or does not have power to legislate concerning racial discrimination by employers engaged in interstate commerce. The authority of the state does not come into existence in the event the exercise thereof will produce a result which may tend to promote a particular cause and then disappear or become impotent when the exercise thereof may lead to a different result. Jurisdiction to function does not depend upon what results will flow from the exercise of regulatory power.

█ The Supreme Court of the United States has clearly indicated that with reference to interstate carriers the regulation of racial discrimination is a matter in which there is a "need for national uniformity," and that the states are without jurisdiction to act in that area. *Morgan v. Virginia*, supra.

The judgment is affirmed.

MR. JUSTICE FRANTZ, MR. JUSTICE McWILLIAMS and MR. JUSTICE PRINGLE dissent.

MR. JUSTICE FRANTZ dissenting:

The overriding and cardinal purpose of this case is to ascertain the relation between federal and state authority based upon the fundaments of the commerce clause

(U.S. Const. Art. 1, § 8, cl. 3) and the equal protection mandate to the states contained in the 14th Amendment to the Federal Constitution. Is there an area of accommodation between nation and state in which the state may act affirmatively to see that no one is denied employment by reason of his "race, creed, color, national origin or ancestry," notwithstanding the employment will require travel over state lines?

The majority opinion believes that a valid reconciliation is not possible, and that the Colorado Anti-Discrimination Act of 1957 is ineffectual as to employment contracts of Continental Air Lines, Inc., an interstate commercial carrier by air. Since I do not share this belief, I voice a view at variance with the majority.

At least five reasons come to my mind which provoke dissent. There may be other cogent and perhaps more convincing reasons for opposing the majority opinion, but those which move me to disagree are, in my opinion, principles established in law and reason. Their application brings into proper perspective the interrelation of the two federal constitutional provisions already adverted to, and establishes the propriety of the Colorado act as it affects Continental's operations. *United States v. Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L. Ed. 1440.

Before launching into a discussion of these reasons it would be well to keep in mind that the Colorado Anti-Discrimination Commission had made findings adverse to Continental, and that these findings are based upon evidence. And the Commission made the critical finding that the only reason that Green "was not selected for training school [was] because of his race." It is suggested that a better understanding of this controversy will be realized by reading the opinions in *Commission v. Continental Air Lines, Inc.,* 143 Colo. 590, 355 P. (2d) 83, to which the present matter is a sequel.

I would now enumerate my reasons for holding the Colorado act to be in harmony with the commerce

clause. 1. A contract of employment is not commerce; it is not an intangible that enters into the stream of commerce just because the employee travels from state to state. 2. Conditions of employment, statutorily imposed, forbidding hiring on the basis of race, creed, color, national origin or ancestry are federally recognized as being properly within the sphere of state police power and in this connection inoffensive to the commerce clause. 3. It is a traditional concept of the federal government that an employment contract is ordinarily controlled by the law of the state where made, and reasonable regulations of the state regarding such contracts will be honored by the nation. 4. State laws prohibiting discrimination on the basis of race, creed, color, national origin or ancestry are in aid of commerce and not a burden on it, and hence sanctioned by the federal government. 5. By enacting laws banning such discrimination the state merely implements and fulfills the interdictions of the 14th Amendment to the national Constitution, and exercises the power delegated thereunder to preserve the rights of citizens, required by the Federal Constitution to be protected by the states.

1. A contract of employment of a pilot of an interstate carrier by air is not interstate commerce. Such contract per se does not move in commerce, although the employment thereunder requires operation of airplanes through several states. If Green had been hired, at once the employment relationship would have been established: Continental as employer and Green as employee would have become a fait accompli. Nothing could be a more localized activity; the creation of the contract arose within the state; its existence resulted from an activity wholly within the state.

True, that which Green would have done as a result of the *established* relationship would have been interstate commerce. Affording due regard to the distinction between the local matter of employment, and the activities of the employee thereafter as commerce, is not a

strained and tenuous process. Federal courts have recognized that the mere fact that a domestic transaction generates a movement in interstate commerce is not sufficient to declare the transaction interstate commerce. *Jewel Tea Co. v. Williams,* (10th Cir.) 118 F. (2d) 202.

Indeed, the federal courts sound warnings against encroachment on state competence. "If the power to regulate interstate commerce applied to all the incidents to which said commerce might give rise and to all contracts which might be made in the course of its transaction, that power would embrace the entire sphere of mercantile activity in any way connected with trade between the states, and would exclude state control over many contracts purely domestic in their nature." *Hooper v. California,* 155 U.S. 648, 15 S.Ct. 207, 39 L.Ed. 297.

"Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. The question is necessarily one of degree." *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

Although the present problem is one without pat precedent, we are not without straws in the wind. The Supreme Court of the United States asked itself "whether a state law taxing occupations is invalid so far as applicable to the pursuit of the business of *hiring persons to labor outside the state limits,* because in conflict with the Federal Constitution." (Emphasis supplied.) *Williams v. Fears,* 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186.

Its answer has relevance to our problem: " * * * These labor contracts *were not in themselves subjects of traffic between the states,* nor was the business of hiring laborers·so immediately connected with interstate transporta-

tion or interstate traffic that it could be correctly said that those who followed it were engaged in interstate commerce, or that the tax on that occupation constituted a burden on such commerce." (Emphasis supplied.)

"[B]y the law of New York the creation of an agency is to be determined by the law of the place where the acts take place which are relied upon to create it." *Siegman v. Meyer,* 100 F. (2d) 367. The question of agency "is to be determined by the law of New York, because the scope of an agent's authority depends upon the law of the place where the authority is conferred." Per Learned Hand in *Still v. Union Circulation,* 101 F. (2d) 11. The place where the contract of employment is made is controlling as to the law. *Moore v. Ill. Central R. Co.,* 136 F. (2d) 412; *Hablas v. Armour & Co.,* 270 F. (2d) 71; *Helfer v. Corona Products,* 127 F. (2d) 612.

Contracts for advertising space in a national magazine, though involving publishing advertising and the mailing and distribution of magazines outside the state, are "peculiarly local and distinct from * * circulation whether or not that circulation be interstate commerce." *Western Live Stock v. Bureau of Internal Revenue,* 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823.

"That which in its consummation is not commerce does not become commerce among the states because the transportation that we have mentioned takes place. To repeat the illustrations given by the court below, a firm of lawyers sending out a member to argue a case, or the Chautauqua lecture bureau sending out lecturers, does not engage in such commerce because the lawyer or lecturer goes to another state." *Federal Baseball Club v. National League,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357.

I would hold that the contract of hiring, as it established an employment relationship, would have been consummated in the State of Colorado and subject to the domestic laws of the state. The fact that Continental engaged itself to carry passengers by air through several

states, and that Green would have been a part of the air flight personnel, would have been an incident of the contract of employment. Continental's engagement to carry passengers would have been interstate commerce. Green's contract would not have been an undertaking to carry *A*, *B* and *C* as passengers outside the state; his engagement would have been to work at a certain position for Continental.

2. A state enactment, having as its objective the prevention of contractual discrimination in employment emanating from prejudice or preference concerning race, religion, color, national origin or ancestry, is sanctioned as the proper exercise of the police power of the state, even though its effect in particular cases may result in an impact on interstate commerce. Where the law thus bears upon such commerce, the federal courts generally find no invalidating encroachment on the national domain in commerce.

That statutory laws prohibiting discrimination on the basis of color, race, creed, national origin or ancestry in connection with certain relationships find validity in the police power cannot be controverted. "The execution of this power and the enactment of laws pursuant to it are necessary to the well-being of the people of all civilized communities." *Bolden v. Grand Rapids Operating Corp.,* 239 Mich. 318, 214 N.W. 241, 53 A.L.R. 183. See "Employment Discrimination," 5 Race Relations Reporter 569 (1960).

Legislation directed against racial or religious discrimination is action "within the bounds of the police power." *New York State Commission v. Pelham Hall Apts.,* 170 N.Y.S. (2d) 750. It is declarative of the state's public policy against discrimination, *Application of Association for the Preservation of Freedom,* 188 N.Y.S. (2d) 885; and its purpose is the promotion "of the public good," *City of Chicago v. Corney,* 13 Ill. App. (2d) 396, 142 N.E. (2d) 160.

Legislative measures aimed against "discriminations in

the areas of employment predicated upon prejudices and preferences arising out of race, religion, color or national origin" establish a public policy for the state concerning the relationship of employer and employee. *U.S. National Bank v. Snodgrass,* 202 Ore. 530, 275 P. (2d) 860, 50 A.L.R. (2d) 725.

Recognition of such legislation as the exercise of the state's police power has been accorded by the Supreme Court of the United States. "And certainly so far as the Federal Constitution is concerned there is no doubt that legislation which prohibits discrimination on the basis of race in the use of facilities serving a public function is within the police power of the states." *District of Columbia v. Thompson Co.,* 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480. See *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072; *Bob-lo Excursion Co. v. Michigan,* 333 U.S. 28, 68 S.Ct. 358, 92 L.Ed. 455.

Conditions of employment between one operating in interstate commerce and an employee, fixed by the state under its police power, have been the subject of attack in the federal courts. Thus, in *Smith v. Alabama,* 124 U.S. 465, 8 S.Ct. 564, 31 L.Ed. 508, a statute of Alabama was claimed to be in violation of the Federal Constitution. The statute made it a misdemeanor for an engineer to operate, *in the state,* a train of cars used for the transportation of persons or freight without first undergoing an examination and obtaining a license from a board appointed by the Governor. The examination involved the character and habits of the applicant. Provision was made for denial or revocation of a license upon certain contingencies appearing.

*Smith v. Alabama* concerned an engineer whose ordinary run was over the Mobile and Ohio Railroad Company's road between Mobile, Alabama and Corinth, Mississippi. He never handled the engine between points wholly within Alabama. He also operated an engine pulling a passenger train between St. Louis and Mobile.

It was contended that the statute contravened the commerce clause of the Federal Constitution.

In disposing of the contention the Supreme Court said:

"In conclusion, we find, therefore, first, that the statute of Alabama, the validity of which is under consideration, is not, considered in its own nature, a regulation of interstate commerce, even when applied as in the case under consideration; secondly, that it is properly an act of legislation within the scope of the admitted power reserved to the State to regulate the relative rights and duties of persons being and acting within its territorial jurisdiction, intended to operate so as to secure for the public, safety of person and property; and, thirdly, that, so far as it affects transactions of commerce among the States, it does so only indirectly, incidentally, and remotely, and not so as to burden or impede them, and, in the particulars in which it touches those transactions at all, it is not in conflict with any express enactment of Congress on the subject, nor contrary to any intention of Congress to be presumed from its silence."

A statute of Alabama provided for the protection of the traveling public against accidents resulting from color-blindness and defective vision of railroad employees, and to that end required an examination before a state board of any person seeking a position that involved the running or management of a railroad train. Its validity was questioned on the theory that it interfered with interstate commerce in the case of *Nashville, C. & St. L. Ry. v. Alabama,* 128 U.S. 96, 9 S.Ct. 28, 32 L.Ed. 352.

The railway company operated its lines through several states and had as a train conductor one who had not secured a certificate of his fitness in compliance with the Alabama statute. After reaffirming the doctrine enunciated in *Smith v. Alabama,* supra, the Supreme Court stated that "[s]uch legislation is not directed against commerce, and only affects it incidentally, and

therefore cannot be called, within the meaning of the Constitution, a regulation of commerce."

A state statute prescribing a not unreasonable number for the crews of freight trains "is not in any proper sense a regulation of interstate commerce nor does it deny the equal protection of the laws. Upon its face, it must be taken as not directed against interstate commerce, but as having been *enacted in aid, not in obstruction, of such commerce* and for the protection of those engaged in such commerce." (Emphasis supplied.) *Chicago, R.I. & Pac. Ry. Co. v. Arkansas*, 219 U.S. 453, 31 S.Ct. 275, 55 L.Ed. 290. See *Missouri Pacific R. Co. v. Norwood*, 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010.

A state may prescribe regulations for the payment of wages of employees of railway carriers, and so far as such law "affects interstate commerce, it does so indirectly." *Erie R. Co. v. Williams*, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155, 51 L.R.A.N.S. 1097. A California statute required every "transportation agent" to obtain a license assuring his fitness and to file a bond securing faithful performance of the transportation contracts which he negotiated. Its apparent purpose was to protect the public from fraud and overreaching. In *California v. Thompson*, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219, the court held the regulation not to be violative of the commerce clause, saying:

"As this Court has often had occasion to point out, the Commerce Clause, in conferring on Congress power to regulate commerce, did not wholly withdraw from the states the power to regulate matters of local concern with respect to which Congress has not exercised its power, even though the regulation affects interstate commerce. Ever since *Willson v. Black Bird Creek Marsh Co.*, 2 Pet. 245, and *Cooley v. Board of Port Wardens*, 12 How. 299, it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number

and diversity may never be adequately dealt with by Congress."

These decisions evidence the solicitude of the Supreme Court for sustaining the police power of the states in matters relating to certain kinds of contracts, and in particular employment relationships, even though the exercise of such power affects interstate commerce. Citation of these authorities does not pretend to be exhaustive, but it represents a good sampling from which we can deduce validity of the act here under attack. See *Colorado Co. v. Colorado Springs*, 61 Colo. 560, 158 Pac. 816.

3. Employment contracts are ordinarily of local concern, and controlled by the laws of the state where made. That they have relation to commerce among the states does not necessarily make them vulnerable to attack as being made pursuant to state laws which affect commerce. Legislation regarding contracts, aimed at regulation of rights, duties and liabilities of the contracting parties, is properly within the sphere of state activity, and even though it affects commerce, such impact is deemed indirect and hence valid. Should the federal government clearly preempt the area in which the state has acted, then exclusion of state action takes place.

Early in its history the Supreme Court of the United States stated that generally "the legislation of a State, *not directed against commerce* or any of its regulations, but relating to the *rights, duties,* and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit." (Emphasis supplied.) *Sherlock v. Alling, Adm.,* 93 U.S. 99, 23 L.Ed. 19.

The doctrine of *Sherlock v. Alling* has been applied in later cases decided by the federal appellate courts. A resort to Shepard's United States Citations reveals its durability. And the doctrine has been applied to statutes

of a state which impose conditions in order to effectuate an employment relationship. *Smith v. Alabama,* supra; *Nashville, C. & St. L. Ry. v. Alabama,* supra; *Chicago, R.I. & Pac. Ry. v. Arkansas,* supra. See *Richmond & Allegheny R.R. v. Tobacco Co.,* 169 U.S. 311, 18 S.Ct. 335, 42 L.Ed. 759; *Chicago, M. & St.P. Ry. v. Solan,* 169 U.S. 133, 18 S.Ct. 289, 42 L.Ed. 688. Last approved in *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed. (2d) 852.

In *Smith v. Alabama,* supra, the court was dealing with state required examination and licensing of locomotive engineers. In holding the state legislation valid and inoffensive to the commerce clause, the court expressly made applicable the above language quoted from *Sherlock v. Alling,* supra. The sanction of the opinion extended to "regulating the *relative rights and duties* of persons within the jurisdiction of the State, *and operating on them,* even when engaged in the business of interstate commerce." (Emphasis supplied.)

Rights and duties settled by contrast afford grounds for state intervention where the state can with propriety establish a public policy regarding them. Particularly is this true in relation to employment contracts—indeed, this has been a fertile field in recent years for the ordination of policy measures. Here personal relations are fundamental, and the greater the skill required of the employee, the greater is the personal element involved.

A contract is a juridically recognized engagement between persons by which their rights and duties concerning a subject matter are established. *Dartmouth College v. Woodward,* 17 U.S. 518, 4 Wheat. 518, 4 L.Ed. 629. Ordinarily, juridical recognition is a matter of domestic concern. And, as already noted, the policy of the state may be exerted to require certain conditions in making the engagement before it shall have a binding effect upon the parties.

Rights and duties imposed by the parties upon them-

selves by agreement are pivotal concepts; to the Supreme Court they have significance in determining whether a matter presented to it indicates an intrusion on commerce. If legislation of the state is patently and essentially concerned with the rights and duties of persons, inter se, and said legislation in particular cases has an incidental or adventitious impingement on commerce among the states, the Supreme Court seems inclined to hold it related to a localized activity, and its influence on commerce not measurably significant.

All the elements necessary to the application of this doctrine are here present. Green is a qualified applicant for a position requiring special skills. A contract between Continental and Green would involve these skills, and hence the personal element creating a special, individual-to-individual relationship with rights and duties pervading it. The generality of the anti-discrimination law, evidently directed to employment generally, without intent to burden commerce, when brought into perspective with the immediate problem of hiring a person with special skills, leaves us with a law innoxious to interstate commerce.

4. The Colorado Anti-Discrimination Act is in aid of, and not a burden on, commerce. States may not deny persons within their jurisdictions the equal protection of the laws. U.S. Const., XIV Amend. May that which the states are prohibited from doing become the subject of harmonious, positive legislation by the states? May the states provide for equal treatment of persons within their jurisdictions by legislation? If they may, does the fact that commerce may be incidentally affected, invalidate such legislation?

"The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from *unfriendly legislation* against them distinctively as colored,—exemption from

legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps toward reducing them to the condition of a subject race." (Emphasis supplied.) *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664. It would appear that *friendly legislation* is implicitly invited.

State laws having local aspects "are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as *legislation in aid of commerce,* and as a rightful exercise of the police power of the State *to regulate the relative rights and duties of all persons and corporations within its limits."* (Emphasis supplied.) *Pennsylvania R.R. Co. v. Hughes,* 191 U.S. 477, 24 S.Ct. 132, 46 L.Ed. 268. *Richmond & Allegheny R.R. v. Tobacco Co.,* supra; *Chicago, M. & St.P. Ry. v. Solan,* supra; *Mobile County v. Kimball,* 102 U.S. 691, 26 L.Ed. 238.

So long as the federal government has not made clear its intent to act exclusively in the regulation of an area of commerce, the nation and the state may march hand in hand concerning it in advancing parallel policies against discrimination based on race, creed or color. *Boblo Excursion Co. v. Michigan,* supra. In a footnote of the opinion the court says, "The direction of national policy is clearly in accord with Michigan policy."

5. Colorado has activated the prohibitions of the Federal 14th Amendment by enacting a law forbidding discrimination in employment based on race, creed, color, national origin or ancestry. Under the 14th Amendment a person has a *federal right* not to be discriminated against by the state on the basis of race, color, creed or national origin; under the Colorado statute the state creates a similar right running against such discrimina-

tion by anyone, including a private party. What was a federal right thus becomes a broadened state right by virtue of the statute. See Abernathy, Expansion of the State Action Concept Under the Fourteenth Amendment, 43 Cornell L. Quar. 375.

The 14th Amendment is directed against discriminatory state action; the Colorado Anti-Discrimination Act is state action, but consistent with, although having a broader base than, the 14th Amendment. See *Bob-lo Excursion Co. v. Michigan,* supra. *Ferguson v. Gies,* 82 Mich. 358, 46 N.W. 718, 21 Am.S.R. 576, 9 L.R.A. 589, indicates that state laws putting "the colored citizen upon an equal footing in all respects with the white citizen" is nothing more than the declaration by the states of what the Federal Constitution ordains.

Contention was made in *Railway Mail Ass'n v. Corsi,* supra, that the New York Civil Rights Law offended the due process clause of the 14th Amendment. It seems to me that the answer of the Supreme Court is a manifestation of a view which would hold the Colorado act valid, as making effectual by state action in an affirmative way the 14th Amendment. The court said:

" * * * We have here a prohibition of discrimination in membership or union services on account of race, creed or color. A judicial determination that such legislation violated the Fourteenth Amendment would be a distortion of the policy manifested in that amendment, which was adopted to prevent state legislation designed to perpetuate discrimination on the basis of race or color. We see no constitutional basis for the contention that a state cannot protect workers from exclusion solely on the basis of race, color or creed by an organization, functioning under the protection of the state, which holds itself out to represent the general business needs of employees."

Since it is seriously doubted whether the federal government has assumed exclusive control of the employ-

ment in question, we should heed these words in the decision of *Railway Mail Ass'n v. Corsi,* supra:

"This provision can hardly be deemed to indicate an intent on the part of Congress to enter and completely absorb the field of regulation of organizations of federal employees. *Congress must clearly manifest an intention to regulate for itself* activities of its employees, which are apart from their governmental duties, before the police power of the state is powerless." (Emphasis supplied.)

No such clear manifestation appears in this case.

In the course of this opinion I have accepted as fact that the Anti-Discrimination Act will on occasion exert an influence on commerce among the states. The act was designed to accomplish a purpose wholly within the letter and spirit of the 14th Amendment, and contains no exception as to employment involving duties requiring movement between states. In this respect interstate commerce will be affected, but not detrimentally. How can it be contended that state action which is obedient to the 14th Amendment does anything other than aid commerce?

Had the federal government clearly acted against discrimination in manner showing that preemption had taken place, the state would have no authority to act. But, as Justice Doyle demonstrated in his specially concurring opinion in *Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc.,* supra, no federal preemption has been effected.

Mr. JUSTICE McWILLIAMS authorizes me to say that he concurs in this dissent.

Mr. JUSTICE PRINGLE dissenting:

The majority does not hold that the Anti-Discrimination Act itself is unconstitutional but only that it cannot apply to employers engaged in interstate commerce, and

relies heavily on *Hall v. DeCuir*, 95 U.S. 485, 24 L.Ed. 547, (1877) to support its position. I agree that if *Hall v. DeCuir*, supra, is to be placed in limbo it can be done only by the hand which promulgated it—the Supreme Court of the United States.

However, I cannot believe that a law passed by a state which implements a basic concept of our form of government—the right of a man, otherwise well qualified, not to be denied a job solely because of his race, color or creed—can be deemed to be a *burden* on interstate commerce.

Moreover, I would point out that, in my opinion, the Colorado Anti-Discrimination statute cannot affect the uniformity of regulation in interstate commerce, for if any state passed a law permitting or requiring the discrimination complained of here, it would certainly be struck down as a violation of the Fourteenth Amendment to the Constitution of the United States. *Brown v. Board of Education*, 347 U.S. 483.